Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION
CASE NO. 2:24-CV-00144-DLB


JEREMY SPENCER                          PLAINTIFF

vs.

JACOB GANSHIRT                          DEFENDANT




* * * * * * * *

DEPONENT:        Jeremy Spencer

DATE:            October 3, 2025

* * * * * * * *



Kristina L. Laker

Court Reporter



BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1        The videotaped deposition of JEREMY SPENCER

2    taken for the purpose of discovery and/or use as

3    evidence in the within action, pursuant to notice,

4    heretofore taken at the Grand Jury Room, Boone

5    County Justice Center, 6025 Rogers Lane, Burlington,

6    Kentucky, on October 3, 2025, at 9:30 a.m., upon

7    oral examination, and to be used in accordance with

8    the Federal Rules of Civil Procedure.

9                    * * * * * * * *

10                     APPEARANCES

11   REPRESENTING THE PLAINTIFF:

12   Jeremy Spencer
     PRO SE
13   1891 Grovepointe Drive
     Florence, KY 41042
14   jackoneil2121@yahoo.com

15   REPRESENTING THE DEFENDANT:

16   Olivia F. Amlung, Esq.
     ADAMS LAW, PLLC
17   40 West Pike Street
     Covington, KY 41011
18   oamlung@adamsattorneys.com

19

20   ALSO PRESENT:  Deputy Jacob Ganshirt, Defendant

21                  Major Tom Szurlinski

22                  Connie Adkins-Ihle, Videographer

23

24

25

1                    I N D E X

2                                              Page

3   Cross-Examination by Ms. Amlung:           5

4

5

6                E X H I B I T S

7   Defendant's Deposition Exhibit No. 1       64

8   Defendant's Deposition Exhibit No. 2       74

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE VIDEOGRAPHER:  We are on

 2     videotape record.  Today is Friday,

 3     October the 3rd, 2025.  The time is 9:33

 4     a.m.  We're here today to take the

 5     deposition of Jeremy Spencer in the case

 6     styled Jeremy Spencer versus Jacob

 7     Ganshirt, United States District Court,

 8     Eastern District of Kentucky, Covington

 9     Division, Case No. 2:24-CV-00144-DLB.

10          Would the attorneys now introduce

11     themselves and state whom they represent.

12          MS. AMLUNG:  Olivia Amlung on behalf

13     of the Defendants.  I am joined here today

14     with Deputy Jacob Ganshirt, as well as

15     Major Tom Szurlinski on behalf of the

16     Boone County Sheriff's Department.

17          THE VIDEOGRAPHER:  And would the

18     court reporter please swear in the

19     witness.

20          THE COURT REPORTER:  Sir, would you

21     please raise your right hand.

22          THE WITNESS:  (Complies.)

23          THE COURT REPORTER:  Do you solemnly

24     swear that the testimony you're about to

25     give will be the truth, the whole truth,

1          and nothing but the truth?

2               THE WITNESS:  I do.

3               THE COURT REPORTER:  Thank you.

4                    JEREMY SPENCER,

5    of lawful age, as having been duly sworn, as

6    hereinafter certified, was examined and testified as

7    follows:

8                    CROSS-EXAMINATION

9    BY MS. AMLUNG:

10       Q.   All right.  Good morning.  Thank you so

11   much for being here, Mr. Spencer, on a Friday.  I'm

12   sure you have lots of other things to be doing.  As

13   I mentioned earlier, my name is Olivia Amlung.  I

14   represent the defendants here in this matter.  So

15   I'm going to start you off with an easy one for you.

16            Can you please just state your name with

17   spelling for the record?

18       A.   My name is Jeremy spelled J-e-r-e-m-y.  My

19   last name is Spencer, S-p-e-n-c-e-r.

20       Q.   Okay.  Mr. Spencer, have you ever been

21   deposed before?

22       A.   No.

23       Q.   Okay.  So I'm just going to go over some

24   general instructions and ground rules then so that

25   we're all on the same page about how kind of today

1  is going to go.  So the purpose of a deposition is

2  really just -- I like to call them fact-finding

3  missions.  So I'm just trying to find out what you

4  know.  I might ask questions that you think are

5  really obvious.  I'm doing it because I want to make

6  sure that my understanding is the same as yours, so

7  bear with me with all of my tedious questions today.

8          One of the biggest rules of the day is

9  that I need verbal answers from you.  A lot of times

10  with yeses and noes we want to uh-huh or shake your

11  head, but since everything is being written to a

12  transcription, we want to make sure that that record

13  has yeses and noes in it.  So if I say something

14  like is that a yes, Mr. Spencer, I'm not trying to

15  be rude, I'm just making sure we have a record

16  that's easily transcribable, okay?

17      A.    Okay.

18      Q.    Sometimes, especially on a Friday morning

19  when I've not had all of my coffee yet, my mouth and

20  my brain are working at very different speeds, and I

21  may ask questions that you just go what on earth are

22  you trying to ask me.  So if I ask a question that

23  you don't understand, just say, hey, can you try

24  that one again and I'm happy to do that.  You won't

25  offend me and if you do, that's my problem, not

1    yours.

2            Another big rule of the day is that we

3    can't talk over one another.  Again, this is all

4    being transcribed, so I will do my very best not to

5    interrupt you, and I would just ask for that same

6    courtesy back to me, okay?

7        A.    I understand that.

8        Q.    Okay.  The last thing I'll ask is that --

9    you were placed under oath; do you understand what

10   that means?

11       A.    It would be under the penalty of perjury,

12   correct?

13       Q.    Yes.  So you have committed to tell the

14   truth today in all of your testimony?

15       A.    Yes.

16       Q.    All right.  So tell me what you did -- I'm

17   sorry?

18       A.    May I ask a question before we begin?

19               MS. AMLUNG:  Sure.

20               MR. SPENCER:  I'd like to make an

21               objection to the service of the video

22               deposition.  And I actually have a copy

23               for you.

24               The objection is to the spelling of

25               the name.  J-e-r-e-m-e-y is not the

1          spelling of my name, J-e-r-e-m-y, which

2          according to Federal Rules of Civil

3          Procedure 30(b)(1), I believe, it needs

4          clarification as to who exactly needs to

5          be deposed.

6              Do you want me to go through the

7          reading, or do you just want me to --

8              MS. AMLUNG:  No.  I am happy to take

9          this.

10              MR. SPENCER:  Okay.

11     Q.   But you're here prepared to give testimony

12  today --

13     A.   Yes.

14     Q.   -- correct?

15     A.   Yes.

16     Q.   Thank you for this.  So what did you do to

17  prepare for your testimony today?

18     A.   Not too much.  To be specific, I reviewed

19  the body camera, I reviewed the citation, which I

20  thought I had with me, and I reviewed some of the

21  legal grounds that I can make objections to.  That's

22  about it, I think.

23     Q.   Okay.  So I see that you have a couple of

24  things on the table in front of you.  Can you just

25  tell me what those things are?

Page 9

1        A.    One is the notice that you gave me.

2        Q.    Okay.

3        A.    One is just general objections that are

4    just basic outlines of what I can object to; for

5    example, objection to form or objection to leading

6    questions.  I don't know if I'll use those, but it's

7    the -- and then these -- I'm not even using these.

8    These are going to be after the deposition.  Do you

9    need to know what they are now?

10       Q.    Yes.

11       A.    Okay.  Well, depending on how the

12   deposition goes, I might be filing a notice of my

13   rights and then there's some supporting case laws.

14       Q.    Okay.  A notice of your rights.  What do

15   you mean by that?

16       A.    Just my constitutional rights, such as the

17   right to remain silent.

18       Q.    Okay.  Understood.

19       A.    Things like that.

20       Q.    Okay.  Understood.  All right.  If you

21   wouldn't mind then, after the deposition is over I'd

22   like to see --

23       A.    Oh, yes.

24       Q.    -- those two things.

25       A.    I'll provide it to you.

Page 10

1      Q.   Great.   Thank you.   Okay.   So this is a
2  very open-ended question.   You can be as long or as
3  short about it as you'd like.   But tell me what your
4  lawsuit is about.
5      A.   September 2- -- what is it -- 27th, 2023,
6  I was stopped for allegedly careless driving and was
7  given a citation by Deputy Ganshirt for careless
8  driving.   He stated that I veered over the white
9  line a couple of times.   And then he concluded the
10 stop by stating, If you don't want to draw attention
11 to yourself, you shouldn't have flipped me off --
12 because I made a middle finger gesture to him prior
13 to the stop.
14     Q.   Okay.   So I think I understand then why
15 you're -- my next question was going to be why are
16 you suing Deputy Jacob Ganshirt.   Can you just
17 articulate that a little bit for me?
18     A.   I made the middle finger gesture while I
19 was traveling and Deputy Ganshirt was traveling in
20 the opposite direction.   And he made a U-turn.   And
21 he proceeded with a stop, wrote the citation for
22 careless driving.   And when he made the comment if
23 you didn't flip me off, I wouldn't have paid
24 attention to you led me to suspect it was
25 retaliation.

1    Q.    Okay.  So you've asserted on your amended

2  complaint that you are suing Deputy Jacob Ganshirt

3  in his individual and his official capacity.  So the

4  official capacity claim means that you're also suing

5  the Boone County Sheriff's Department.  Can you

6  explain why you're suing them?

7    A.    I forget the exact code, but the Kentucky

8  Revised Code -- I think it might have been 50.20 --

9  says the sheriff has responsibility for his

10  deputies' actions.  I could be wrong on that.  But I

11  know if I Googled it, that would come up.  Did I

12  answer your question fully?

13    Q.    It sure does.

14    A.    Okay.

15    Q.    Thank you.  So we're going to take a pause

16  on talking about September 27, 2023, and I'm going

17  to ask you just some questions about you, okay?

18    A.    Uh-huh.

19    Q.    So have you ever gone by any other aliases

20  besides Jeremy Spencer?

21    A.    Could you clarify as to what you mean by

22  aliases?

23    Q.    Sure.  So have you ever had a different

24  last name, first name, nickname, anything else that

25  you've been known by?

Page 12

1        A.    Could you clarify whether that would be

2    within legal documents or just like common

3    nicknames?

4        Q.    Legal documents first.

5        A.    By legal documents, no.

6        Q.    Okay.  Have you ever gone by any other

7    alias, not necessarily, you know, what your mom

8    calls you or anything, but anything that you've,

9    let's say, applied for a job with this name or gone

10   to school under this name?

11       A.    Oh.  I've only used Jeremy Spencer in

12   legal documents, applications for jobs, at schools.

13       Q.    Okay.  Do you go by a middle name or

14   anything?

15       A.    I do have a middle name.  Patrick.

16       Q.    Okay.  Mr. Spencer, how old are you?

17       A.    37.

18              MS. AMLUNG:  We are going to go off

19              the record briefly to get date of birth

20              and social security number.

21              (Off the record.)

22              THE VIDEOGRAPHER:  Back on the

23              record.

24   BY MS. AMLUNG:

25       Q.    Okay.  Where do you currently live,

Page 13

1    Mr. Spencer?

2         A.    Can you define what you mean by where I

3    currently live, more specific?

4         Q.    What's your current home address?

5         A.    I use the address 1891 Grovepointe Drive,

6    Florence, Kentucky 41042.

7         Q.    Okay.  1891 Grovepointe Drive.  So you

8    said I use the address.  Is that not what your

9    license says?

10        A.    My license is in Ohio.

11        Q.    Okay.

12        A.    I use the Kentucky address as a forum for

13   mail.

14        Q.    Okay.  So what's your address in Ohio

15   then?

16        A.    Do you mind if I look at my license; is

17   that okay?

18        Q.    Sure.  You're fine.

19        A.    It's 3932 Banks Road, Cincinnati 45- --

20   sorry -- it's 45245.

21        Q.    45245.  Okay.  So where do you go to sleep

22   at night, in Cincinnati or in Florence?

23        A.    It depends.

24        Q.    It depends.  Okay.  The 1891 Grovepointe

25   Drive, is that a house, an apartment, a condo?

Page 14

1        A.    It's a house.

2        Q.    It's a house.  Do you own the house?

3        A.    No.

4        Q.    Okay.  Who owns that house?

5        A.    My parents.

6        Q.    Your -- I'm sorry?

7        A.    My parents.

8        Q.    Your parents.  Okay.  What are your

9  parents' names?

10        A.    Paul Spencer and Roberta Spencer.

11        Q.    Roberta Spencer.  Okay.  Does anybody else

12  live in that house with you?

13        A.    No, that's it.

14        Q.    Okay.  What about the 3932 Banks Road; is

15  that a house, an apartment?

16        A.    It's an apartment complex.

17        Q.    An apartment complex.  Okay.  Is there an

18  apartment number specific that you live in?

19        A.    No.

20        Q.    Okay.  Are you the, I guess, leased tenant

21  on that apartment, or do you live with someone else

22  there?

23        A.    I'm not leased anymore.  Actually I'm

24  having to update my information, so. . .

25        Q.    Okay.  When was the last time you lived at

Page 15

1    the 3932 Banks Road?

2        A.   I -- I don't recall.

3        Q.   Okay.  So it's on your license, but you're

4    not -- you wouldn't call that your home right now?

5        A.   Not right now.

6        Q.   Okay.  Do you remember when you would last

7    have considered it to be your home?

8        A.   I don't recall.  I'm sorry.

9        Q.   Okay.  What about prior -- or when did

10   you, I guess, move over to the 3932 Banks Road; do

11   you remember when you first started living there?

12       A.   2016, but I don't remember -- I think

13   maybe March or April.

14            THE COURT REPORTER:  2016, but I

15            don't -- what's the rest?

16            THE WITNESS:  I don't remember, maybe

17            March or April.

18            THE COURT REPORTER:  March or April.

19            Thank you.

20       Q.   Where did you live at before then?

21       A.   I don't recall.

22       Q.   Okay.  Was it in Ohio or in Kentucky?

23       A.   It was in Ohio.

24       Q.   It was in Ohio.  Cincinnati still?

25       A.   No.  I don't remember -- it was either --

Page 16

1    I think it was Niles or Wauseon maybe.  I'm not -- I

2    moved around a lot in the early 2000-teens.

3        Q.   Okay.  Where did you graduate high

4    school -- or did you graduate high school I guess

5    should have been my first question?

6                MR. SPENCER:  Can I object to the

7            relevance of that?

8                MS. AMLUNG:  You can object, but you

9            still have to answer.

10               MR. SPENCER:  I know, I'm just. . .

11       A.   Sandy Valley, Magnolia, Ohio.

12       Q.   I'm sorry.  Can you --

13       A.   It's Sandy Valley High School.  And I

14   think it's in Magnolia, Ohio.

15       Q.   Okay.  When did you graduate?

16       A.   2007.

17       Q.   Okay.  After you graduated from Sandy

18   Valley -- is that one word or two?

19       A.   Two words.

20       Q.   Two words.

21       A.   Well, Sandy Valley is one word.  Sorry.

22       Q.   Okay.  Sandy Valley, and is it exactly how

23   it sounds --

24       A.   Yeah.

25       Q.   -- Sandy Valley?  Okay.  So after you

Page 17

1    graduated in 2007 did you attend any college

2    institutions?

3         A.   Yes.

4         Q.   Okay.  Where did you go?

5         A.   Hocking Technical College.

6         Q.   Where is that?

7         A.   Nelsonville, Ohio.

8         Q.   Did you get any kind of degree or

9    certificate from Hocking Technical College?

10        A.   I got a degree in -- it's an associate's

11   degree in natural and historical interpretation.

12   The old term was naturalist.  So if you want to put

13   naturalist, it's the. . .

14        Q.   Okay.  What does that entail?

15        A.   So pretty much the -- if you went to go to

16   Yellowstone and you see a park ranger -- not a park

17   ranger, but a park official giving tour guides and

18   telling you about the natural history, that's the

19   type of job that typically it could get you or

20   working at a museum like the Cincinnati museum.

21        Q.   So was that your objective, to try and

22   work at a museum or a park?

23        A.   Yes.

24        Q.   Okay.  So after you obtained the

25   associate's degree in natural and historical

Page 18

1    interpretation -- well, first of all, I guess -- I'm

2    sorry -- when did you get that degree?

3         A.    2010, I believe.

4         Q.    Okay.  So after you got that degree in

5    2010, did you obtain any additional education?

6         A.    I continued on taking more classes at

7    Bowling Green State University.  But I did not

8    complete any degrees.

9         Q.    What kind of classes were you taking?

10        A.    I don't recall.  I mean, it was the basic

11   math, science, social -- well, I shouldn't say

12   science, but -- I mean, they were science-based

13   classes.

14        Q.    Did you have a plan to obtain a

15   bachelor's, or were you just taking them for the

16   sake of taking them?

17        A.    When I went to Bowling Green, I was trying

18   to obtain a bachelor's.

19        Q.    Bachelor's in what?

20        A.    I forget what Bowling Green even called

21   the thing, but it's -- it would be pretty much the

22   same thing.

23        Q.    So maybe a different label, but the

24   same --

25        A.    Yeah.

Page 19

1        Q.    -- basic program?

2        A.    Yes.

3        Q.    Okay.  So aside from your associate's

4    degree, do you have any professional licenses or

5    certifications?

6        A.    Not that I recall.

7        Q.    Where do you currently work?

8        A.    I'm sorry.  Can you clarify?

9        Q.    Do you currently have a source of income?

10       A.    Yes.

11       Q.    Okay.  What do you do to obtain that

12   income?

13       A.    I'm a merchandiser for Masterpiece Flower

14   Company.

15       Q.    Tell me about Masterpiece Flower Company.

16       A.    It is a company that has a contract with

17   Meijer's grocery store.  So I'll go to different

18   Meijer stores to put out new flowers, work in the

19   garden section.

20       Q.    Okay.  So you go to different Meijers to

21   put out flowers in the grocery store sections; is

22   that --

23       A.    Yes.

24       Q.    -- what you said?

25       A.    Yeah.

Page 20

1      Q.    Okay.  Are you an owner of Masterpiece

2  Flower Company or an employee or an independent

3  contractor?

4      A.    Employee.

5      Q.    Employee.  Okay.  How long have you been

6  an employee with them?

7      A.    2001, starting in March.

8      Q.    So you've worked there for over 20 years?

9      A.    Sorry.  2021.

10      Q.    Oh, okay.  What's your rate of pay?

11      A.    $17 an hour.

12      Q.    $17 an hour.  How many hours a week do you

13  work?

14      A.    That varies by the season.  But if you

15  were to average it out throughout the year, it would

16  range between -- my personal estimate -- and this

17  would be a guess -- is about 20 hours -- yeah, 20

18  hours a week.

19      Q.    So some weeks could be more, some could be

20  less?

21      A.    Correct.

22      Q.    Okay.  All right.  So I would assume that

23  this is considered part-time work, so do you get any

24  benefits from them?

25      A.    No.

Page 21

1        Q.    Okay.  Do you have any other employment?

2        A.    No.

3        Q.    Okay.  Do you have any other sources of

4   income?

5        A.    Yes.

6        Q.    Okay.  What are those other sources of

7   income?

8        A.    That would be my artwork.

9        Q.    Okay.  Tell me a little bit about that.

10       A.    Can you be more specific?

11       Q.    Sure.  What kind of art do you make and

12  who do you sell it to?

13       A.    It would be taxidermy style.  And that's

14  kind of a vague name for it.  But we'll just go with

15  taxidermy because it's easy to say, if that's okay.

16  And I sell it to -- well, I've made sales to

17  museums, to veterinary doctors, and to universities,

18  and to private individuals.

19       Q.    How long have you been doing that?

20       A.    About 2018.

21       Q.    How did you get into that?

22       A.    So from my college degree, if I were to

23  pursue a job in the museums, part of that would be

24  procuring and preserving specimens from the natural

25  world.  So pretty much the taxidermy you see in a

1    museum, the skeletons, things like that.

2        Q.   So how are you normally -- well, I guess

3    strike that.

4            How do people find you to ask for these

5    taxidermy pieces?

6        A.   I go to -- I guess you'd call them art

7    shows and then the -- and then I used to do eBay,

8    but not anymore.

9        Q.   Okay.  So is it usually just word of

10   mouth, people find you at an art show?

11       A.   Yes.

12       Q.   Do you advertise in any other way besides

13   the art shows?

14       A.   No.

15       Q.   Okay.  How much per year -- I know you

16   probably don't have an exact accounting, but about

17   how much per year are you making through your

18   taxidermy artwork?

19       A.   So it's been growing since then, because

20   I've been dedicating more time to that.  I know it

21   started off low and around two or three thousand for

22   the year of like 2018, 2019.  And then, of course,

23   '21 -- the year 2020 everyone had off because of

24   COVID, so -- but after that it did increase, which I

25   did provide you an affidavit --

1        Q.    Sure.

2        A.    -- for a few weeks ago -- I think maybe a

3    week ago.

4        Q.    Yep.

5        A.    Did you guys receive that?

6        Q.    Yes.

7        A.    Okay.

8        Q.    Yes.  And we'll look at that later.  But

9    right now I'm just trying to get a general feel,

10   so -- I mean, if you had to estimate how much in the

11   year -- let's say how much this last year -- this

12   last full year, so 2024?

13       A.    2024, up till today I've only made about

14   3,000, maybe a little over.

15       Q.    Okay.  So other than working at

16   Masterpiece Flower Company and then your personal

17   artwork, do you have any other sources of income?

18       A.    Kind -- I want to say kind of.

19       Q.    Okay.

20       A.    I was also pursuing honey beekeeping.

21       Q.    Okay.

22       A.    So it's been -- because I know you're

23   going to ask it.  I started that back in 2018.  And

24   it's been a hobby.  And I was -- up until 2023 I

25   might have sold a few jars of honey every now and

Page 24

1    then just because I had some surplus, but it wasn't

2    like a job.  It was more like a yard sale.  You

3    know, I'd make maybe a hundred or so.  But I was

4    investing money into supplies for the beekeeping.

5         Q.    Do you currently have hives?

6         A.    Yes.

7         Q.    Okay.  Where do you keep those hives?

8         A.    I have a friend over in Batavia that has

9    some farmland I keep them on.

10        Q.    How many hives do you have?

11        A.    The last time I checked I had three.

12        Q.    About how many hours per week do you

13   devote to that?

14        A.    Beekeeping you don't really -- well, can

15   you specify as -- how can I. . .

16        Q.    Okay.  Here, I might be able to ask --

17        A.    Yeah.

18        Q.    -- a question that can help facilitate

19   your response.

20        A.    Okay.

21        Q.    So you'll have to forgive my ignorance.

22   What does beekeeping entail?

23        A.    That's better.  So with beekeeping I have

24   to put time and energy into making the hive boxes

25   and assembling the frames.  And then I also have to

1   put time into maintaining the hives themselves,

2   where I physically go and inspect the hives, opening

3   it up, I got the suit on, making sure that the bees

4   don't have any diseases or parasites.

5        Q.   How frequently do you have to go

6   physically inspect the hives?

7        A.   I would have to inspect the hives

8   typically two or three times a month.

9        Q.   I'm sorry.  Per month?

10       A.   Yes.

11       Q.   Okay.  How often can you collect honey

12   from those hives?

13       A.   You can collect honey -- provided that the

14   weather has been in favor of good flower production

15   and the bees are able to, you know, collect the

16   nectar and make the honey, you can collect honey

17   twice a year, once in the spring, usually in June --

18   end of May, beginning of June, and in the fall

19   around end of September, beginning of October.

20       Q.   So it's about that time?

21       A.   Yes.

22       Q.   Have you gone to collect your honey yet

23   this year?

24       A.   I checked on them at the beginning of

25   September, and they were almost empty.  But golden

Page 26

```
 1    hour hasn't bloomed yet.
 2         Q.   Okay.
 3         A.   So I have to go back soon to check.
 4         Q.   Sure.  About how much honey is yielded
 5    from your hives each time you collect?
 6         A.   So I can answer statistics on that.
 7         Q.   I want to know about your hives
 8    specifically.
 9         A.   Okay.  So with my hives specifically
10    for -- are you wanting to know this year or past
11    years?
12         Q.   How about you tell me about this year and
13    last year?
14         A.   Okay.  So last year I collected about five
15    gallons of honey for the year.  And I had three
16    hives at two as well.
17         Q.   Okay.  So five gallons.  So that's
18    collective between all three hives in both
19    collections; was that your total?
20         A.   Yes.
21         Q.   Okay.  So what do you do when you collect
22    those -- oh, I'm sorry.
23         A.   I didn't answer your second part.
24         Q.   Oh, I'm sorry.  Go ahead.
25         A.   For this year I've only collected five
```

Page 27

1    gallons as well.  But keep in mind, it's only been

2    from the spring.  And I -- given that they were

3    empty in the beginning of September, I -- and I have

4    not checked them, I can't speak to any honey

5    collection for the fall.

6          Q.  Is it normal to get a double collection

7    like from year to year?

8          A.  Depending on how you manage your bees and

9    your objective, you could collect two -- you could

10   make two hives of honey for the year.

11         Q.  So after you collect the honey, what do

12   you do with it?

13         A.  Until recently I've been just using it for

14   personal use with the occasional surplus that I

15   would sell to neighbors for a few dollars.

16         Q.  So you said until recently.  So what are

17   you doing with it now?

18         A.  It's just personal use.

19         Q.  Okay.

20         A.  Because I don't have enough to sell to

21   neighbors.

22         Q.  Do you anticipate having surplus after

23   your next collection?

24         A.  No.

25         Q.  No.  Okay.

Page 28

1      A.   I -- just out of anticipation, given that

2   we've had the drought for the last few weeks, I

3   suspect I won't have honey to harvest for the fall.

4      Q.   Understood.  It has definitely been a

5   little on the dry side.  Okay.  When you said that

6   you have invested time and money into your

7   beekeeping efforts, how much money have you invested

8   in that?

9      A.   That's a good question.  I know I've

10  invested two hundred -- two or three hundred dollars

11  into just the frames, which would be a wooden frame.

12  And then in the middle of that there's either a

13  plastic preshaped honeycomb that they build wax off

14  of and then store.  And then the other option is a

15  wax honeycomb, which -- because I do both -- the wax

16  honeycomb that they build off of I use in the honey

17  section of the hive.

18          For the box itself, I have not calculated

19  how much I've invested into that.  I've only -- I

20  haven't actually calculated how many boxes I've

21  built so far.

22     Q.   Okay.

23     A.   I know I can tell you I have 10 -- let me

24  rephrase this.  I can build up to 10 hives, which

25  would contain two deeps, which would be the big

Page 29

1   boxes where the -- where the bees would have the

2   brood, which would be the baby bees and the larvae.

3   And that would be two medium supers on top where you

4   would get your honey.  So if you do some math, let's

5   see, 10 -- it's too early in the morning for math.

6   Are you good at math?

7        Q.   I am not.  That's why I went to law

8   school.

9        A.   Yeah, I can't.

10       Q.   Okay.  That's perfectly fine.

11       A.   If you want me to do the math, I can do

12  that math.

13       Q.   No, that's okay.  I appreciate the effort

14  and willingness, though.  Okay.  So I did ask, you

15  know, sources of income, and you said honey bee as

16  one of those sources of income.

17            So about how much money have you made, do

18  you think, in the honey beekeeping venture?

19       A.   Can you provide a -- do you mean over the

20  entire time frame since I started till now?

21       Q.   Yes.

22       A.   Okay.  I would estimate four or five

23  hundred.  And that's just the sale of honey.

24       Q.   So that's not, you know, excluding the

25  expenses to make the honey, right?

Page 30

1          A.    I have not excluded any expenses from

2    that, yeah.

3          Q.    Okay.

4          A.    So I -- I know for each jar I sell you

5    have probably about 75 cents to buy just the jar,

6    you know.

7          Q.    Sure.  About how much are you able to make

8    from that per year, do you think?

9          A.    Can you restate that?

10         Q.    Sure.  So I asked you, you know, of

11   course, how much do you think in total, and you said

12   you've been doing this from 2018.  So about how much

13   do you think you make from your honey beekeeping per

14   year?

15         A.    Maybe 200.

16         Q.    Okay.  All right.  So thus far you've

17   indicated that you're employed part-time through

18   Masterpiece Flower Company, you get sources of

19   income through your artwork sales for your taxidermy

20   artwork, and then some income as well from honey

21   beekeeping.  Do you have any other sources of

22   income?

23         A.    No.

24         Q.    Okay.  Aside from Masterpiece Flower

25   Company -- you said you've been working there since

Page 31

1    2021.  So prior to working at Flowerpiece

2    Masterpiece -- or I'm sorry -- Masterpiece Flower

3    Company, were you actually employed somewhere; did

4    you go to work at a job and do anything of that

5    nature?

6         A.   Before Masterpiece Flower Company?

7         Q.   Yes.

8         A.   I was employed at a store called LuLu's

9    Pet Pantry.

10        Q.   Okay.

11        A.   It's located in Burlington off of Route

12   18.

13        Q.   Okay.  About when were the dates of your

14   employment?

15        A.   The beginning of 20- -- oh, yeah.  The

16   beginning of 2021, I believe -- wait.  Let me think.

17   I think I started at the end of 2020.

18        Q.   Okay.  I won't hold you to the dates.

19        A.   Okay.

20        Q.   There won't be a quiz later.

21        A.   All right.

22        Q.   Okay.  When did you leave LuLu's Pet

23   Pantry?

24        A.   A month before I started at Masterpiece

25   Flower Company.

Page 32

1      Q.   Okay.  Why did you leave LuLu's Pet

2   Pantry?

3      A.   I was fired but was not given a reason

4   why.

5      Q.   Okay.  Tell me a little bit about what was

6   communicated to you then.

7      A.   I don't remember.

8      Q.   Okay.  How much were you making at LuLu's

9   Pet Pantry?

10      A.   I think $15.00 an hour, 15.25.  But I

11   don't really remember.  That's just a guess.

12      Q.   Okay.  Other than the lawsuit of course

13   that we're here to talk about today, have you ever

14   filed another lawsuit?

15              MR. SPENCER:  I'm going to object to

16           the vagueness of the question, because it

17           doesn't say the time frame.  So if you can

18           say the time frame.

19      Q.   Well, I want to know if you've ever done

20   one, so --

21      A.   Oh, if I've ever?

22      Q.   Yeah.

23      A.   Okay.  I'm sorry.

24      Q.   That's okay.

25      A.   I didn't have enough coffee.  I have filed

Page 33

1    one -- actually I filed three in Ohio in federal

2    court.

3         Q.    Okay.

4         A.    I filed them this year.

5         Q.    This year?

6         A.    Yes.

7         Q.    All three of them?

8         A.    Yes.

9         Q.    Was that the Southern District of Ohio or

10   the Northern?

11        A.    The Southern District of Ohio.

12        Q.    Okay.

13        A.    I filed them in Columbus, Ohio.

14        Q.    Tell me about those three lawsuits.  I'm

15   going to ask, do you have case numbers for those

16   three lawsuits?

17        A.    I do have case numbers.  I don't remember

18   what they are right now.

19        Q.    Okay.

20        A.    One lawsuit is against three officers for

21   withholding religious property after an inventory

22   search of my vehicle.  And those -- the religious

23   property was not held as evidence and it was

24   withheld for an extended period of time.

25        Q.    What religious property was taken by them?

Page 34

1      A.   There was -- to pre-answer your question,

2   I practice Native American spirituality.  So the

3   religious items was a headdress, a couple of black

4   bearskins, some jewelry, and -- yeah.

5      Q.   Okay.  So that's the first lawsuit.

6   What's the second lawsuit?

7      A.   The second lawsuit is against the judge

8   and prosecutor and the defense attorney I had from

9   the allegations in that -- in the Vinton County

10   court case.

11              MS. AMLUNG:  Okay.

12              THE WITNESS:  May I have a water?

13              MS. AMLUNG:  Go off the record for a

14         moment.

15              (Off the record.)

16              THE VIDEOGRAPHER:  We are back on the

17         record.

18   BY MS. AMLUNG:

19      Q.   Okay.  So I asked about the second

20   lawsuit.  You said it was against the judge,

21   prosecutor, and defense in -- and then I couldn't

22   hear what your -- your second half of the answer.

23      A.   Yes.  So the -- I don't remember all the

24   charges I brought against them, but I know it was in

25   part because at the beginning of the stages of the

Page 35

1    trial, I informed the judge and prosecutor that my

2    religious property was being held that was not

3    evidence, and I would like them to be returned.  And

4    they did not -- the prosecutor did not mention that

5    they had the items.  And my lawyer failed to act on

6    my behalf to protect my constitutional rights.  The

7    same with the judge, they -- he had sua sponte

8    actions to release the items or inquire more into

9    that.  So that's the main basis of the. . .

10        Q.   Okay.  And what about the third lawsuit?

11        A.   The third lawsuit is against the county

12   jail that I was held in for ten days.  I was

13   requiring medical attention for digestive issues,

14   which they did not provide adequate remedy for.  And

15   I also felt the treatment upon entering the jail was

16   excessive.

17        Q.   How so?

18        A.   And the other thing for the jail is I felt

19   that they violated the -- I believe it's the Fourth

20   Amendment, right to feel secure within your persons

21   and effects.

22        Q.   Okay.  Based on what you just described to

23   me with those three lawsuits, it sounds like you

24   were arrested and charged in Ohio; is that a fair

25   deduction there?

Page 36

1        A.    Yes.

2        Q.    Okay.  Can you tell me a little bit about

3    that arrest?

4              MR. SPENCER:  I'm -- again, I'm going

5              to make an objection, just that it's not

6              relevant to the traffic stop, but I'm

7              going to answer.  And I'm -- also part of

8              that objection is that it's after -- like

9              a year after the Ganshirt traffic stop.

10       A.    But to answer, allegedly I was arrested

11   for a bench warrant in regards to a traffic citation

12   for driving with a suspended license.  And upon the

13   arrest and I'm -- and given the paperwork that I

14   found through open records request, I am still

15   uncertain and unclear if that was truly why I was

16   arrested, because the jail documents say I was being

17   held for being a felon for a weapons under

18   disability charge.  At the time I was at a shooting

19   range target practicing, and somehow they said I was

20   a felon and I was in possession of being a felon

21   with weapons -- with firearms.

22       Q.    So you were --

23       A.    And they also added on four counts of

24   aggravated menacing, alleging that I was threatening

25   loggers.  Does that answer your question accurately?

Page 37

1        Q.    Sure.  But I have some follow-ups.

2        A.    Okay.

3        Q.    Okay.  So you said at the time you were at

4    a shooting range?

5        A.    When I was confronted by the arresting

6    officer, yes.

7        Q.    Okay.  So it wasn't a traffic stop then?

8        A.    No.

9        Q.    Okay.  What county in Ohio was this in?

10       A.    Vinton County.

11       Q.    Vinton?

12       A.    Yes.  V-i-n-t-o-n.

13       Q.    I've never heard of that county before.

14   Where is that?

15       A.    It is the next county west of Athens

16   County.  So have you heard of Ohio University?

17       Q.    Okay.  When did that arrest occur?

18       A.    May 1st of 2024.

19       Q.    What were you doing up there that day?

20       A.    Just relaxing.  I was going to be hiking,

21   but the loggers where I was going to hike at --

22   obviously they were busy doing their thing, so I

23   left and decided to do my next thing, which was go

24   to target practice.  There's an outdoor range that

25   is within the state forest area.

Page 38

1          Q.    Okay.  Other than that arrest in May of

2     2024 have you ever been arrested for anything else?

3          A.    Yes.

4          Q.    Okay.  Can you tell me about each of those

5     arrests?

6          A.    It was only once before.  It was here in

7     Boone County, Kentucky.  It was for allegedly I

8     think a second-degree assault.  It was a fight

9     between myself and my father.  The neighbors seen

10    this fight as it was in our backyard -- well, his

11    backyard.  And the sheriff's department came out.  I

12    think that's all I can remember right now.

13         Q.    Okay.  So you were arrested.  Were you

14    convicted?

15         A.    No.  Well, I don't fully understand what

16    classifies as conviction as I believe the case

17    concluded upon an amended complaint, so I'll state I

18    was not convicted of the assault -- the original

19    assault charge.

20         Q.    Okay.  So --

21         A.    Which the original assault charge was a

22    felony.

23         Q.    Do you remember what you pled to then?

24         A.    I don't remember exactly.  I can only

25    speculate that it was disorderly conduct maybe.  I

Page 39

1    know it was a misdemeanor.

2         Q.   Okay.  When was that?

3         A.   I think it was 2022.  In May or April.

4         Q.   And you said it was the Boone County

5    Sheriff's Department that effectuated that arrest?

6         A.   Yes.

7         Q.   Okay.  Do you remember which deputy?

8         A.   No.  I don't remember -- I can't remember

9    any cops that were there.

10        Q.   Okay.  Is it fair to say since it was not

11   memorable that you did not have a bad experience

12   with the sheriff's department?

13        A.   No, I would not say that.

14        Q.   I asked a terrible question because no, I

15   would not say is actually a double negative, so I'm

16   sorry.

17             Did you file any complaints with the

18   sheriff's department after that encounter with its

19   deputies?

20        A.   No.

21        Q.   Other than that arrest as well as the

22   arrest in Ohio that we just talked about, any other

23   arrests?

24        A.   Not that I can recall.

25        Q.   Okay.  Have you ever been cited with a

Page 40

1    traffic ticket other than the one, of course, that

2    we're here to talk about today?

3        A.    Yes.

4        Q.    Okay.  When was the last time you were

5    cited for a traffic ticket other than the one we're

6    here to talk about today?

7        A.    I have a vague recollection of failure to

8    stop at a stop sign here in Boone County.  I know

9    that was during the year 2020, because the courts

10   shut down during my trial case, so that kind of

11   delayed my court case.  There was actually two, but

12   I don't remember the months or much of the

13   interactions.

14       Q.    Okay.  So two failure to stops here in

15   Boone County?

16       A.    Yes.

17       Q.    Okay.  But they were at separate times?

18       A.    Yes.

19       Q.    Okay.  And both in 2020?

20       A.    I know one was in 2020.  One might have

21   been in 2019, but I'm not sure.

22       Q.    Okay.  So it sounds like you do spend a

23   decent amount of time in Boone County; is that fair

24   to say?

25       A.    Yes.

Page 41

1       Q.   Okay.  Is that visiting your parents or

2  otherwise?

3       A.   Visiting my parents and then working at

4  the Meijer's store.

5       Q.   Okay.

6       A.   Because I'm not sure if Meijer's is in

7  Boone County or if it's the next county.  I don't

8  know what the county lines are.

9       Q.   Sure.  So through Masterpiece Flower

10 Company do you only work at the Meijer here in

11 Florence, or do you work at multiple different

12 Meijers delivering flowers?

13      A.   I don't actually deliver the flowers.

14      Q.   Oh, okay.

15      A.   I just do the merchandising.  So I unpack

16 the boxes and unpack the cartons and make it look

17 pretty and water them.

18      Q.   Understood.

19      A.   But I do go to Cold Spring, Eastgate, and

20 Norwood from -- on occasions.  It depends on the

21 year and the need.

22      Q.   Okay.  All right.  Other than those

23 citations for traffic tickets and the arrests that

24 we talked about, have you ever had any other just

25 general encounters with law enforcement?

Page 42

1        A.    Well, the other traffic tickets I got --

2        Q.    Oh.  Okay.  Yeah.

3        A.    -- might have been -- and I don't remember

4   the years or the months.  I can guess on the years,

5   I think.  There was a traffic ticket in Boone --

6   Brown County, Ohio, for allegedly doing 90 in a 60.

7   I think that was 2018 or 2019.

8        Q.    Okay.

9        A.    But, I'm sorry, can you repeat your

10  question?

11       Q.    Any other traffic tickets?

12       A.    Oh.  Those are the ones I can remember.

13       Q.    Okay.  I'm trying to do the math.  When

14  did you first get your driver's license?

15       A.    Would it say that on a driver's license or

16  can I look at the driver's license?

17       Q.    No.

18       A.    I wasn't sure.  I think I was 18 or 19.

19       Q.    Okay.

20       A.    I know it was after I graduated -- after I

21  graduated high school.

22       Q.    Okay.  So then you went a good probably

23  ten years without getting a ticket?

24       A.    I wouldn't say that.  I know -- I know

25  there was a traffic ticket within the first year of

Page 43

1    getting my license.  I don't remember.

2        Q.   Sure.

3        A.   I just know it was in Ohio.  But I don't

4    remember much about it.

5        Q.   Okay.  So you have -- we've gone over a

6    couple of traffic tickets in Boone County and then

7    in Brown County, Ohio.  Any other counties in Ohio

8    that you think you've had a traffic ticket in?

9        A.   I don't recall.

10       Q.   Okay.  Have you ever been in a car

11   accident?

12       A.   Can you restate the question?

13       Q.   Have you ever been the driver in a car

14   accident?

15            MR. SPENCER:  Well, I'm going to

16            object to the use of the word driver.

17            Given that there's -- when reading the

18            laws, there's some ambiguity to that.

19            But without waiving my objection,

20            I'll answer that.

21       A.   I was cited for improper backing in Vinton

22   County October 31, 2023, yeah, which is what led to

23   that bench warrant I mentioned earlier.

24       Q.   Okay.  And did you hit something then?

25       A.   Yeah.  So the improper backing -- I was

Page 44

1    backing out of a driveway, which was a very steep

2    hill.  There was a vehicle that was stopped

3    diagonally in the road.  He was a firefighter.  And

4    he was preventing traffic from traveling down the

5    road due to an obstruction.

6              And that volunteer firefighter was outside

7    of his vehicle, standing next to another passerby

8    talking to him.  I informed him I was backing up.

9    And upon doing so, the back end of my car made a

10   small dent in his driver door.

11       Q.   And he was a firefighter.  So did you ding

12   the firetruck?

13       A.   No.  No.  It was his personal vehicle.

14       Q.   Okay.

15       A.   He was close to it when I made the call.

16       Q.   Okay.

17       A.   And I think he was a volunteer

18   firefighter.  I don't know if that makes a

19   difference, but. . .

20       Q.   Okay.  Have you ever been involved as the

21   operator of a motor vehicle in any other traffic

22   accidents?

23              MR. SPENCER:  I'm going to object to

24         the use of the word operator and motor

25         vehicle, again, the legal ambiguity within

Page 45

1            statutes and codes.  And without waiving

2            the objection, I'm going to answer.

3       A.    No.

4       Q.    Okay.  Have you ever filed a social

5   security disability claim?

6       A.    No.

7       Q.    Have you ever filed a workers'

8   compensation claim?

9       A.    No.

10      Q.    Have you ever been the defendant in a

11  civil lawsuit before?

12      A.    No, I don't think I have.

13      Q.    Okay.  Other than this lawsuit and the

14  three federal lawsuits that you currently have

15  pending in Ohio, have you ever been involved in any

16  other kind of legal proceeding or lawsuit?  And the

17  traffic tickets, of course.  I apologize.

18      A.    Since you said any other legal proceeding,

19  I have filed a writ of mandamus upon the court clerk

20  with Vinton County for failure to properly respond

21  to an open records request in accordance to the law

22  and for failure to file documents into my case.

23      Q.    Okay.  Is that related to --

24      A.    And that was related to the three federal

25  lawsuits that are related to the arrest that

Page 46

1    happened on May 1.

2        Q.    Okay.   Where did you file the writ of

3    mandamus?

4        A.    Within the Ohio Supreme Court.

5        Q.    Okay.   Any other legal proceedings in

6    which you've been involved that we have not yet

7    discussed?

8        A.    I do not believe so.

9        Q.    Okay.   Have you ever been treated for

10   alcohol or drug abuse?

11       A.    No.

12       Q.    Are you currently as you sit here today

13   under the influence of alcohol?

14       A.    No.

15       Q.    Are you currently as you sit here today

16   under the influence of drugs?

17       A.    No.

18       Q.    Have you consumed any alcohol within the

19   last 24 hours?

20       A.    No.

21       Q.    Have you consumed any type of narcotic

22   controlled substance in the last 24 hours?

23       A.    No.

24       Q.    Okay.   Are you on any medications as you

25   sit here today?

Page 47

1      A.    No.

2      Q.    Okay.  Do you have social media?

3            MR. SPENCER:  I'm going to object to

4            the ambiguity of the question.

5      Q.    Do you have a social media account through

6   Facebook?

7      A.    Can you rephrase the question one more

8   time?

9      Q.    Do you have a Facebook account?

10     A.    I'm not sure how to answer that question.

11     Q.    If I said here's Facebook, the Internet

12  portal --

13     A.    Yes.

14     Q.    -- do you have an email and password in

15  which you could log in?

16     A.    Yes.

17     Q.    Okay.  What is your Facebook name?

18     A.    Jack Trades.

19     Q.    Trades?

20     A.    Yes.

21     Q.    T-r-a-d-e-s?

22     A.    Yes.

23     Q.    Is that one word or two?

24     A.    Jack Trades would be two words.

25     Q.    Okay.  So it's like a first and last --

Page 48

1     A.    Yeah.

2     Q.    -- name kind of situation?

3     A.    Yeah.

4     Q.    Yes?

5     A.    Yeah.

6     Q.    Okay.  Do you have an Instagram account?

7     A.    No.

8     Q.    Okay.  Snapchat?

9     A.    No.

10    Q.    Any other type of generally classified

11  social media account besides Facebook?

12    A.    Does Google accounts count as -- like a

13  Google email, does that count as a social media

14  thing?

15    Q.    No, I don't think so, but -- I mean, we

16  have your Gmail address from communications.  Thank

17  you.

18    A.    Then, no, there's nothing.

19    Q.    Okay.  On your social media account have

20  you made any posts, commentary, or anything about

21  the pending lawsuit that we're here to talk about

22  today?

23    A.    I have not made any statements in regards

24  to the Ganshirt case on social media.

25    Q.    Okay.  In your social media account have

Page 49

1   you ever made any general posts, sentiments, or

2   otherwise about police officers in general?

3        A.   About police officers in general?  Oh,

4   yeah, probably.

5        Q.   Okay.  What kind of sentiments do you

6   express about police officers on Facebook?

7        A.   Can you rephrase the question?

8        Q.   Sure.  Do you like cops?

9        A.   No.

10       Q.   Why?

11       A.   I feel officers lack a lot of training and

12   education about the law, and that creates a lot of

13   controversies that are needless.

14       Q.   Are you speaking from personal

15   interactions and experience with police officers or

16   your general assumptions?

17       A.   Personal interactions and from witnessing

18   other people's interactions.

19       Q.   Okay.  Prior to your interaction with

20   Deputy Ganshirt, had you ever had a negative

21   interaction with the Boone County Sheriff's

22   Department?

23       A.   No.

24       Q.   Okay.  So what personal interactions with

25   police have led you to this belief that you have

Page 50

1    about officers you just expressed?

2        A.   What -- can we get back to that question a

3    later time?

4        Q.   No.

5        A.   Okay.  Because I can't think of anything

6    right now.

7        Q.   Okay.  All right.  So let's switch gears a

8    little bit and talk specifically about September 27,

9    2023.  So when I reference, you know, this lawsuit

10   or this interaction, can we both be on the same page

11   that I'm talking about the September 27, 2023,

12   interaction with Deputy Ganshirt?

13       A.   Okay.

14       Q.   Okay.  All right.  So September 27, 2023,

15   where did you wake up that morning?

16       A.   Would you like an address?

17       Q.   Uh-huh.

18       A.   I woke up at the 1891 Grovepointe Drive

19   address.

20       Q.   Okay.  So that's your parents' home?

21       A.   At my parents' house, yes.

22       Q.   Okay.  Were you regularly staying at your

23   parents' home at that time?

24       A.   Yes.

25       Q.   Okay.  Would you say that in September of

Page 51

1    2023 you were living there full-time?

2         A.   Yes.

3         Q.   All right.  So about what time did you

4    wake up that morning?

5         A.   About 7:30 a.m.

6         Q.   Is that usual?

7         A.   Yes.

8         Q.   Do you wake up with an alarm or do you

9    just wake up naturally?

10        A.   An alarm.

11        Q.   Okay.  Why do you set an alarm at 7:30?

12        A.   I had to work that day.

13        Q.   Work where?

14        A.   I had to drive to the Meijer's in Florence

15   to -- yeah.

16        Q.   What time were you expected to be at

17   Meijer's in Florence?

18        A.   9:00 a.m.

19        Q.   Okay.  So you wake up at 7:30.  What do

20   you do?  Tell me about your morning routine.

21        A.   I eat breakfast.  Take my mom's dog for a

22   walk.  Obviously change my clothes and brush my

23   teeth.

24        Q.   Sure.

25        A.   And then I leave.

Page 52

1      Q.   Okay.  What route do you take to get to

2   Meijer's in Florence from the home that you were

3   living at?

4      A.   So from Grovepointe Drive I drive -- I

5   guess it's in north -- a northern type of direction

6   heading towards Route 18 on Oakbrook Drive.  So I'm

7   on Oakbrook Drive.  I cross over Route 18 onto Aero

8   Park Driveway.  And then I take a right.  And I

9   don't know what the road name is, but it goes past

10  Walmart.

11     Q.   Houston?

12     A.   Well, no, it goes to Houston.  But it goes

13  past that Wayfair factory.

14     Q.   Okay.  I know what you're talking about.

15     A.   And after that I then go on to Houston to

16  Meijer's.

17     Q.   Okay.  Yeah, I can't remember the name of

18  that little street either, but I know what you're

19  talking about.  So when did you first observe a

20  Boone County Sheriff's Department vehicle?

21     A.   I noticed it when I was on Oakbrook Drive.

22  Prior to a four-way stop -- I think it's called

23  Limaburg -- or something -- Road, which that road is

24  two intersections south of Route 18.  It goes to --

25  it goes to an apartment complex.  And then the other

Page 53

1    direction heads up towards Wendy's and a gas

2    station, I think.

3          Q.    Okay.  When you first observed the

4    sheriff's department cruiser, what was it doing?

5          A.    The cruiser was driving in the opposite

6    lane heading southward.

7          Q.    What did you do when you saw the cruiser?

8          A.    I lifted my left hand and extended my

9    middle finger.

10         Q.    Inside the vehicle or outside the vehicle?

11         A.    Within the vehicle.

12         Q.    Okay.  Were your windows up or down?

13         A.    My windows were up.

14         Q.    Okay.  Why?

15         A.    It was sprinkling that morning.

16         Q.    Oh, I apologize.  Why did you flip him

17   off?

18         A.    Oh, I'm sorry.

19         Q.    No, I'm sorry.  I asked a bad question.

20         A.    Why did I flip him off?

21         Q.    Uh-huh.

22         A.    I was in a bad mood that morning, thinking

23   about injustices that cops tend to inflict upon --

24   that in my opinion inflict upon others.  And then I

25   don't recall if there was any relation to other

Page 54

1   experiences I had in connection to that thought

2   personally.

3       Q.   So earlier you testified, though, that

4   prior to this time you had never had a negative

5   interaction with the Boone County Sheriff's

6   Department; do you recall that?

7       A.   Yes.

8       Q.   Okay.  Do you flip off all police officers

9   when you see them, or just Deputy Ganshirt on this

10  particular morning?

11      A.   If you were to interview my mother, I'm

12  sure she could tell you that I've flipped off other

13  officers randomly at times.

14      Q.   Do you only flip off police officers while

15  you drive, or do you flip off other people as well?

16      A.   I've probably flipped off some other

17  people as well.

18      Q.   Would you say that this is a regular

19  practice for you?

20      A.   No.

21      Q.   Okay.  About how frequently do you flip

22  off people while you drive?

23      A.   Can you give a time frame?

24      Q.   Just on any given day.

25      A.   Oh, on a given day -- well, can I do a

Page 55

1    given week?

2          Q.    Okay.  How about in any given week?

3          A.    Within a given week, maybe once, if that.

4          Q.    Okay.

5          A.    I'd probably say less than that.

6          Q.    Is this the first time you've ever flipped

7    off a Boone County Sheriff's Department Deputy?

8          A.    No.

9          Q.    Okay.  Do you know about how many times

10   you have flipped off deputies before while driving?

11         A.    No.

12         Q.    Okay.  But you have done it before?

13         A.    Yes.

14         Q.    Okay.  So after you flip off Deputy

15   Ganshirt, tell me what happens.

16         A.    Can you be more specific as to what

17   happens?

18         Q.    Well, just tell me what happens next.  So

19   you're driving and then what's the next event that

20   happens?

21         A.    Oh.  In relation to me traveling after I

22   have flipped him off, I look in my left-side mirror

23   and I see he continues -- the vehicle continues.

24   And I stop at the stop signs.  And if I recall, I

25   had to stop at the traffic light of Oakbrook Drive

1    and 18 for whatever time that that stoplight is.

2        Q.    Okay.  So when you flip off Deputy

3    Ganshirt, was your car moving or was it at a stop

4    sign?

5        A.    It was moving.

6        Q.    Okay.  Was his cruiser moving or at a stop

7    sign?

8        A.    From what I recall it was moving.  It was

9    after the four-way intersection.

10       Q.    Okay.  Did you make eye contact with him,

11   did you make any other type of gesture, or was it

12   straight up you moved your arm, moved your finger,

13   and kept on driving about your business?

14       A.    I don't recall seeing Ganshirt and making

15   eye contact or anything of that such.  It was more

16   just I flipped -- I lifted up my hand and made the

17   gesture.

18       Q.    Okay.  So then you continue down, stop at

19   the stop sign or stop signs, depending on how many

20   there were -- I don't recall what you said, I

21   apologize -- and you get to the traffic light, okay?

22       A.    Yes.

23       Q.    When is the next time you saw Deputy

24   Ganshirt's cruiser?

25       A.    It was on Aero Park Drive -- is it Park

Page 57

1    Drive or Aero -- what's the full name?

2         Q.   I think it's Aero Parkway.

3         A.   Aero Parkway.  Okay.  So Aero Parkway

4    after I passed Day One Drive.  And that was due to

5    seeing the flashing lights in the mirror.

6         Q.   Okay.  So when you see the flashing

7    lights, what's your response?

8         A.    My first thought is if he was in my lane

9    or the lane beside me, because it's a four-lane

10   road.  Once I determined he was behind me, I pulled

11   to the side of the road to see if he'll pass by or

12   if he was going to stop me.

13        Q.   Okay.  Then what happens?

14        A.   I roll down my window.  Ganshirt

15   approached my vehicle, introduced himself.  And I

16   think he told me the reason for the stop, but I

17   don't recall exactly if he did that.

18        Q.   Okay.

19        A.   He asked for my license, insurance,

20   registration, and I handed that to him.  And while I

21   did that, I believe he asked me where I was coming

22   from.  I told him I don't have to answer questions.

23   And I believe he also asked another question, but I

24   don't recall exactly what it was.

25             And then he went to the cruiser.  And he

Page 58

1    wrote the traffic ticket.  And after -- he then

2    approached my vehicle with the citation for careless

3    driving and told me about that -- you know, told me

4    about the ticket saying it's payable or I could go

5    to court.  And then after he handed me the ticket he

6    made the statement, If you don't want to draw

7    attention to yourself, don't flip me off.

8         Q.   Okay.  When Deputy Ganshirt first

9    approached your vehicle, you said you couldn't

10   remember whether or not he told you why he pulled

11   you over; is that correct?

12        A.   I believe he said it's because I went over

13   the white fog line.

14        Q.   Okay.  Did you go over the white fog line?

15        A.   I don't recall.

16        Q.   Okay.  Do you remember what your response

17   to him was when he said that you went over the fog

18   line?

19        A.   I believe I said I was probably sneezing.

20        Q.   Okay.

21        A.   Because I have allergies.

22        Q.   Why did you say that?

23        A.   I know at some point trying to drive I was

24   sneezing.

25        Q.   Okay.  But I guess my question is isn't

Page 59

1    really -- I understand that you were probably

2    sneezing at some point.  But when he said you went

3    over the fog line, why did you respond to let him

4    know that you were sneezing?

5         A.    I don't know.  I felt like it was relevant

6    for some reason.

7         Q.    Can you sneeze with your eyes open?

8         A.    I don't believe so.

9         Q.    So is it fair to say then that there was

10   at least some period of that drive where your eyes

11   were closed because you were sneezing?

12        A.    Sure.

13        Q.    Could you have gone over the fog line

14   while your eyes were closed?

15        A.    Yes, it's possible.

16        Q.    Okay.  So then you're not saying you know

17   that you did go over the fog line, but is it fair to

18   say that you don't know for sure if you did not?

19        A.    I'm sorry.  Can you just repeat that

20   again?

21        Q.    Sure.  So I know -- okay.  Let me just

22   ask.  So did you go over the fog line?  I believe I

23   asked you that and you said you weren't sure.

24                  MR. SPENCER:  Yeah, I'm going to

25             object because I think that calls for

Page 60

1              speculation, but without waiving the

2              objection.

3      A.    I don't believe I went over the fog line.

4      Q.    But your eyes were closed at least at some

5  period during that drive because you were sneezing,

6  correct?

7      A.    Yes.

8      Q.    Okay.  So when I asked you -- so you're

9  not saying that you did it, but is it also true that

10  you're not necessarily disagreeing that you went

11  over the fog line?

12      A.    Am I disagreeing that I went over the fog

13  line; is that what you're asking?

14      Q.    Sure.

15      A.    Okay.  I haven't really thought about

16  that.  No, I can't -- I can't say I disagree or

17  agree.

18      Q.    Okay.

19      A.    I feel like that's speculation.

20      Q.    Okay.  Well, in the seconds that you were

21  sneezing and your eyes were closed, is it possible

22  that you went over the fog line and just didn't

23  realize it?

24      A.    I would say that's speculation and there's

25  always the possibility.

1          MS. AMLUNG:  Okay.

2          MR. SPENCER:  Also, I want to object

3              to the use of your term seconds, because

4              typically a sneeze lasts milliseconds.

5      Q.   Okay.  That's fair.

6      A.   Okay.

7      Q.   Okay.  So other than the comment about you

8  don't want to draw attention to yourself, up until

9  that time during the traffic stop was Deputy

10 Ganshirt rude to you at any point?

11     A.   No.

12     Q.   Did he yell at you?

13     A.   No.

14     Q.   Did he make mean commentary to you?

15     A.   No.

16     Q.   Would you consider him to have been polite

17 up until that point?

18     A.   Yes.

19     Q.   Okay.  So tell me about I guess

20 thereafter.  So he hands you the citation and then

21 what do you do?

22     A.   I think I asked him about getting an

23 earlier court date.  And I recall making a -- I

24 recall asking a question for some kind of

25 clarification, but I don't recall exactly what it

Page 62

1   was.

2       Q.   Was he rude to you in response to your

3   questions?

4       A.   No.

5       Q.   Okay.  Did he yell at you?

6       A.   No.

7       Q.   Okay.  About how long would you estimate

8   that your entire interaction with Deputy Ganshirt

9   was?

10      A.   Not including when he was in the vehicle

11  writing the ticket, maybe a total of five minutes.

12      Q.   Okay.  Do you know including the time in

13  the vehicle about how long were you stopped on the

14  side of the road?

15      A.   I would estimate no more than 15.

16      Q.   Okay.  So after he goes back to his

17  cruiser, you have your traffic ticket, what do you

18  do after that?

19      A.   I continue to travel to work.  I get to

20  the little road -- I can't remember the name -- that

21  goes to Wayfair and heads towards Houston.  I recall

22  Ganshirt was driving behind me.  And as I merged to

23  my right-hand turn lane, he continued on to where

24  his vehicle became parallel with mine in view.  And

25  I gave him another middle finger and continued on

Page 63

1    with my travels to work.

2         Q.   Okay.  Did he stop you again after the

3    second middle finger?

4         A.   No.

5         Q.   Okay.  So you testified that about the

6    entire interaction from stop, he goes back to his

7    vehicle to write the ticket, comes back and gives it

8    to you, you said that lasted no longer than 15

9    minutes; is that correct?

10        A.   That's an estimated time, yes.

11        Q.   Sure.  I'm not going to hold you to that

12   for sure.  So we've talked earlier about the other

13   tickets that you've received in the past, the other

14   citations you've been issued.  Is 15 minutes an

15   excessively long period of time compared to the

16   other times that you have been stopped by police

17   officers?

18        A.   Fifteen minutes for the stop I would say

19   is a reasonable amount of time.

20        Q.   Okay.  Did Deputy Ganshirt exhibit more or

21   less levels of politeness, I suppose, compared to

22   the other officers you've interacted with?

23        A.   His politeness was reasonable and equal.

24        Q.   Okay.  So I noticed that your violation

25   time according to -- well, here.  Actually I can do

Page 64

1    this for you.  I'm going to hand you what -- can I

2    have an exhibit sticker, please?

3                   THE COURT REPORTER:  Absolutely.

4                   (Defendant's Deposition Exhibit No. 1

5                   was marked for identification.)

6        Q.   So I'm going to hand you what's been

7    marked as Exhibit 1.  Do you recognize that

8    document?

9        A.   It appears to be the citation I was

10   issued.

11       Q.   Okay.  So if you look about midway down

12   that citation where it says date and time on the

13   left-hand side, it says violation date, 9/27/2023;

14   is that fair, the same day we've been talking about?

15       A.   Yes.

16       Q.   That violation time at 9:19 a.m., do you

17   agree or disagree with that time?

18       A.   I would agree.

19       Q.   Okay.  So you mentioned earlier that you

20   were supposed to be at work at 9:00 a.m. that

21   morning; do you remember that?

22       A.   So there's some nuances to about my time

23   at work.

24       Q.   Okay.

25       A.   I can set my own schedule.  So while I

Page 65

1    typically try to be there at 9:00, I don't get

2    penalized if I'm late -- at least not by 20 minutes

3    late.

4          Q.   Okay.

5          A.   A few hours, maybe.

6          Q.   Okay.  So were you in a rush to get to

7    work, though?

8          A.   No.

9          Q.   Okay.  As the day went on did you talk to

10   anyone about your stop?

11         A.   I don't recall.

12         Q.   Okay.  Did you -- strike that.

13              What made you decide that you wanted to

14   file a lawsuit against Deputy Ganshirt?

15         A.   Upon research of the laws and my

16   constitutional rights and given his statement of if

17   you didn't want to draw attention to yourself, don't

18   flip me off, I felt that it was a retaliatory stop.

19   And when reading the violation code that is cited on

20   this document and given the description of what he

21   wrote, it doesn't meet the standards for the

22   citation -- for the violation.  Sorry.

23         Q.   What do you mean by that?

24         A.   So from what I recall, careless driving

25   was at the time -- at the time of this citation

Page 66

1   writing, it was written as the person has to travel

2   within a way that is safe in regards to other

3   people's safety upon the road or alongside of the

4   road.  The citation -- or the -- not the citation,

5   but the statute does not mention anything in regards

6   to any lines, whether it's the white line or the

7   yellow line.

8        Q.   So is it fair to say that your opinion is

9   that going over the fog line on any number of

10  occasions does not constitute reckless driving -- or

11  careless driving?  I apologize.

12       A.   Can you resay that exactly how you did?

13       Q.   Sure.  So is it your opinion that veering

14  over the fog line does not constitute careless

15  driving?

16       A.   Yes.

17       Q.   Okay.  So you've asserted two claims in

18  your most recent amended complaint.  And you've

19  referenced both of them, so I want to talk about

20  those.  So your first one is First Amendment

21  retaliation.  Okay.  What does that mean to you?

22       A.   So since there's various subsections under

23  the First Amendment ranging from freedom of press,

24  freedom of speech, freedom of religion, mine is

25  specifically to freedom of speech, which hand

Page 67

1    gestures have been considered by the courts forms of

2    speech.  Does that answer your question?

3         Q.   Okay.  So what -- and I'm not trying to

4    trick you into, you know, throwing about some legal

5    jargon.  I'm genuinely trying to understand the

6    basis for your claims, okay?

7         A.   Yes.

8         Q.   So you don't need to try and be hyper

9    technical.

10        A.   No.  No.  I'm just trying to make sure I'm

11   answering things properly.

12        Q.   I appreciate that.  So my understanding

13   then is the freedom -- or the free speech that you

14   engaged in is flipping off Deputy Ganshirt, correct?

15        A.   Yes.

16        Q.   So what are you saying is the act of

17   retaliation in which he engaged?

18        A.   Well, since -- since we were both

19   traveling in different directions, he had to make a

20   U-turn.  As to why he made the U-turn is I guess

21   part of this lawsuit, because I'm arguing that he

22   made the U-turn as -- you know, in regards to me

23   flipping him off.  And his statement strongly

24   suggests that.

25        Q.   Okay.  Do you think it was illegal for him

Page 68

1    to drive behind you?

2        A.    No.

3        Q.    Okay.  So then do you think it was illegal

4    for him to do the U-turn?

5        A.    Yes.

6        Q.    Why?

7        A.    From what I recall in the statutes,

8    officers are supposed to abide by the law unless

9    there is an emergency in which they have to activate

10   their lights and sirens in which that then -- only

11   then would permit them to violate traffic codes,

12   such as speeding, running red lights and stop signs,

13   and making U-turns.

14       Q.    Were you personally in your vehicle

15   affected solely by the fact that he did a U-turn?

16       A.    No.

17       Q.    Okay.  So he does the U-turn.  Did he do

18   the U-turn at the intersection or in the middle of

19   the roadway?

20       A.    I -- given the topography of the land and

21   roadway and that I have to focus on what's in front

22   of me and not behind me, I did not see Ganshirt make

23   a U-turn.

24       Q.    Okay.  So all you know is that at some

25   point he's behind you?

Page 69

1        A.    Yes.

2        Q.    Okay.  And I apologize, I think you might

3   have said this earlier, but when did you first

4   notice he was behind you?

5        A.    When we were on Aero Park Drive when he --

6   when the lights were flashing.

7        Q.    Okay.  So that was the first time that you

8   noticed he was behind you at all?

9        A.    Yes.

10       Q.    Okay.  How do you know for sure that the

11  officer that you flipped off is the same one that

12  pulled you over?

13       A.    Because of his statement, if you didn't

14  flip me off.

15       Q.    Okay.  So that's how you know?

16       A.    Yes.

17       Q.    Okay.  Do you think aside from the fact

18  that he -- that you flipped him off, do you think

19  that Officer Ganshirt -- or, I'm sorry, Deputy

20  Ganshirt had the right to pull you over?

21       A.    No.

22       Q.    Okay.  But you testified earlier that you

23  weren't sure if you went over the white line; do you

24  remember that?

25       A.    Correct.

Page 70

1          Q.   If you had gone over the white line,

2     assuming -- and I understand that you disagree --

3     assuming that was a violation of traffic code, would

4     you agree that would have been appropriate for him

5     to pull you over?

6          A.   If there was a traffic code that says

7     going over the white line violates a statute, then

8     yes.

9                    MR. SPENCER:  But, again, I'm

10               objecting as that's speculation.

11          Q.   Okay.  You also asserted a claim for --

12     well, can you explain your second claim to me?

13     Because you asserted one claim for First Amendment

14     retaliation.

15          A.   Yes.  The second claim would be seizure of

16     my person, you know, stopping me.

17          Q.   Okay.  What does that mean to you?

18          A.   So since I believe that he did not have

19     reasonable articulable suspicion of a crime or

20     probable cause of a crime that is about to be

21     committed or has been committed, he did not have the

22     authority to stop me and -- yeah.

23          Q.   Okay.  So then you would agree then this

24     goes back to the going over the white line you don't

25     believe is a violation of traffic code?

Page 71

1       A.   Correct.

2       Q.   Okay.  So let's talk about the Boone

3   County Sheriff's Department then.  Are you familiar

4   with the department policies, procedures,

5   reputation, practice, anything about the Boone

6   County Sheriff's Department?

7       A.   The only policies that I'm aware of would

8   be what was provided during discovery, which I have

9   not fully reviewed or remember.

10      Q.   Okay.  Are you aware of any kind of -- I

11  understand you haven't reviewed them all, but are

12  you aware of any policy or just generalized practice

13  of the sheriff's department that basically says,

14  hey, we want our deputies to go out and stop people

15  who flip them off?

16      A.   I'm not -- I don't think that the

17  sheriff's department has a policy that says that.

18      Q.   Okay.  Do you think that that's a standard

19  practice of people at the sheriff's department?

20      A.   No.

21      Q.   Aside from the statute that you referenced

22  earlier do you have any other reason that you can

23  articulate to me for which you are bringing a

24  lawsuit against the sheriff's department?

25      A.   I'm sorry.  Can you. . .

Page 72

1        Q.    Sure.

2        A.    I zoned out there for a minute.  Can you

3    just please --

4        Q.    You're fine.  And I forgot, I also

5    apologize, I didn't say this earlier.  If at any

6    point you want to stop and take a restroom break or

7    a five-minute breather, you're more than welcome to

8    do that.

9        A.    I know.

10       Q.    Okay.  I apologize.  Usually I give that

11   in my big spiel at the beginning, but I forgot.  I

12   have not had enough coffee this morning.

13            So earlier I asked you, you know, why are

14   you suing the sheriff's department and you

15   referenced a specific statute that under Kentucky

16   law says they're responsible for the actions of

17   their deputies; is that --

18       A.    Oh, yes.

19       Q.    -- a fair --

20       A.    Yes.  Uh-huh.

21       Q.    Okay.  Aside from your knowledge of that

22   statute is there any other reason that you are suing

23   the Boone County Sheriff's Department?

24       A.    No.

25       Q.    Okay.  All right.  So let's get into kind

Page 73

1    of the specifics of -- well, actually wait.  We'll

2    wait on your affidavit.  We'll get to this in a

3    minute.

4              After this traffic stop happened, how did

5    this interaction with Deputy Ganshirt affect your

6    life?

7        A.    When I -- when I went to the Boone County

8    court on the date as cited on the citation, which is

9    October 23 at 9:30, I informed -- well, one, I was

10   angry as I attempted to speak to the judge about the

11   matter of the retaliation.  And he began to speak

12   over me, along with the bailiff that was there,

13   informed him that was a retaliatory stop.

14             I then proceeded to further educate myself

15   in the laws and court proceedings and obtain

16   information through open records request.  And

17   towards the end of I'll say -- that took several

18   months.  So during that time they -- I believe they

19   put out a bench warrant, but I'm not sure about

20   that.  But that did not affect me that I know of.

21             But when I did return to court to address

22   the matter, I had to attend several court dates for

23   defending myself, which distracts me from the time

24   to tend to my bees and the time it takes me to read

25   and review the laws and draft paperwork takes time

Page 74

1    away from my artwork and my honey bees.

2        Q.    Okay.

3        A.    It's also caused just the stress of that

4    because it gives me some anxiety.

5        Q.    Okay.  I'm going to --

6              MR. SPENCER:  Do you mind if we do

7              take a five-minute break?

8              MS. AMLUNG:  Sure.  Absolutely.

9              MR. SPENCER:  All right.

10             MS. AMLUNG:  Yeah, by all means.

11             THE VIDEOGRAPHER:  We are off the

12             record 11:13.

13             (A brief recess was taken.)

14             THE VIDEOGRAPHER:  We are back on the

15             record.  This is Media 2 of today's

16             deposition.  The time is 11:25.

17             (Defendant's Deposition Exhibit No. 2

18             was marked for identification.)

19   BY MS. AMLUNG:

20       Q.    Okay.  So we are back on the record.

21   Mr. Spencer, I'm going to hand you what's been

22   marked as Exhibit 2.  Do you recognize this

23   document?

24       A.    Yes.

25       Q.    Okay.  Can you tell me what this is?

Page 75

1       A.   This is the affidavit I filed I believe a

2  week ago or so.

3       Q.   Okay.  What was the purpose of this

4  document; why did you draft it?

5       A.   So the affidavit I drafted to show the

6  financial decline that has occurred since I'm having

7  to pursue redress for my civil rights deprivation.

8                 THE COURT REPORTER:  For my what?

9                 THE WITNESS:  For the civil rights

10             deprivation.

11                 THE COURT REPORTER:  Civil rights.

12             Thank you.

13       Q.   Okay.  So we're going to just kind of go

14  through this and I want you to explain where these

15  different sources of information came from and how

16  you came to the ultimate numbers that you did for

17  these damages claims, okay?

18       A.   (No response.)

19       Q.   Okay?

20       A.   Okay.

21       Q.   So let's start with time capacity.  What

22  does this mean to you?

23       A.   Are you talking about the entire section

24  or just the phrase time capacity?

25       Q.   The section.

Page 76

1        A.    Okay.   So the time capacity section is to

2    provide the math that shows, you know, you have 24

3    hours in a day.   I spend about ten hours for

4    sleeping, okay?   And then so the other amounts of

5    the day are dedicated to other things such as work

6    or cooking, eating.   And I think that's pretty much

7    what it all covers.   Unless you want to talk about

8    the other subsections such as bee income potential

9    and. . .

10       Q.    Sure.   So let me -- you know, I'm trying

11   to get through this affidavit and I really just want

12   to know where your head is at and how it relates to

13   the damages that you're going to claim in this

14   lawsuit, okay?

15       A.    Yeah.

16       Q.    So I see this time capacity section as a

17   generalized this is how much time I have available

18   to me in the day?

19       A.    Yes.   And I'd like to clarify that it

20   shows, you know, how much time is put towards

21   sleeping, how much time is put towards cooking, and

22   then how much is like -- in lack of better terms --

23   free time that would have been dedicated towards

24   doing my artwork and beekeeping.

25       Q.    Okay.

Page 77

1          A.   So if it says free time, it more means

2    time that should have been spent to that but was

3    allocated to doing court procedures as a result of

4    the stop.

5          Q.   Okay.  So when you say at the end of or --

6    so I guess the end of this first page, so line 29

7    into 30 of page two --

8          A.   Uh-huh.

9          Q.   -- of this, I reasonably could have

10   dedicated out about 1,240 hours specifically to

11   managing, maintaining, and expanding beekeeping

12   operations; do you see that?

13         A.   Yes.

14         Q.   Okay.  What would that have entailed,

15   meaning what would you have done during those 1,200

16   hours of time?

17         A.   So that would have been things such as

18   building more beehives, talking to potential

19   property owners, farmers that would allow me to put

20   hives on there, harvesting honey, checking hives to

21   make sure that they're healthy.  Yeah.

22         Q.   Okay.  So is it your testimony that you

23   would have dedicated 1,240 -- or, I'm sorry, 1,240

24   hours to your beekeeping venture if you were not

25   cited by Deputy Ganshirt?

Page 78

1          A.    I would say the 1,240 hours was the

2   potential maximum that I could have dedicated,

3   because I was attempting to go -- would have been

4   attempting to go from three hives to 20 hives, but

5   yes.  Does that answer your question?

6          Q.    It doesn't.

7          A.    Okay.

8          Q.    So let me ask a different one.

9          A.    Okay.

10         Q.    So you have 1,240 hours or -- I'm sorry --

11  1,240 hours available based on this calculus of

12  hours --

13         A.    Yes.

14         Q.    -- in the day --

15         A.    Yes.

16         Q.    -- okay?

17         A.    Yeah.

18         Q.    So is it your testimony that all 1,240 of

19  those hours would have been dedicated to beekeeping,

20  but you could not dedicate it because Deputy

21  Ganshirt cited you on September 27, 2023?

22         A.    I couldn't say that the entire total hours

23  would have been dedicated, but that's what I could

24  have allocated for.

25         Q.    Okay.  But how did the citation you

Page 79

1    received prevent you from expending this time on

2    your beekeeping venture?

3        A.    Because I had to research laws, go to

4    court, defend myself, which takes time to do.

5        Q.    So is it your testimony that you spent

6    1,240 hours going to court, doing legal research,

7    and otherwise being involved in defending yourself

8    against this citation?

9        A.    Not just defending against the citation,

10   but also having to proceed with this federal case.

11       Q.    Okay.  So you filed an affidavit in the

12   Boone District Court case, a bill of costs, that

13   indicates you expended six hours for legal research

14   and labor.  So then if you have claimed under threat

15   of perjury, because this is a document -- a court

16   document, six hours related to the criminal case, is

17   it your testimony then that you have expended 1,234

18   hours preparing for the civil lawsuit through legal

19   research and other research ventures?

20       A.    I haven't actually kept a record of every

21   time I sat down at the computer to -- or gone to the

22   library -- law library to research.  So it's more of

23   an estimated time.

24       Q.    Okay.  And you think that you've spent

25   over 1,200 hours at this point preparing for this

Page 80

1    lawsuit?

2         A.   I suppose so.

3         Q.   About how many days a week do you spend

4    researching for this lawsuit?

5         A.   Days -- how many days a week -- probably

6    three or four.

7         Q.   Okay.  About how many hours per day?

8         A.   How many hours per day?  I am not too

9    sure.

10        Q.   Okay.  Is it an hour or two, is it a full

11   eight-hour day?

12              MR. SPENCER:  I'm going to object

13              because that kind of counts for

14              speculation.

15        A.   But it's -- I -- maybe four or five hours.

16   I mean, it varies from day to day because my

17   workload varies at my job with Masterpiece Flowers.

18        Q.   Okay.  So it's your testimony that you

19   spend approximately four to five hours three to four

20   days a week on this lawsuit?

21        A.   Possibly.

22        Q.   Well, I'm not trying to belabor the point

23   here, but you have filed an affidavit, which means

24   that this is, again, a signed document under threat

25   of perjury asserting that you have 1,240 hours of

Page 81

1    time that this lawsuit has diverted from your

2    beekeeping venture.  So we really do need to get

3    into the specifics of those numbers.

4         A.    Yeah.

5         Q.    Okay.  So we're going to do a little bit

6    of math, so bear with me, I'm going to use my

7    calculator.  Again, I went to law school because I'm

8    bad at math.  So let's say -- you said three to four

9    days a week and four or five hours.  Are you willing

10   to commit to one of those numbers?

11        A.    Let's estimate on the higher end.

12        Q.    Okay.  So we're still estimating, though,

13   right?

14        A.    Yes.

15        Q.    Okay.  So five hours per day and you said

16   four days a week?

17        A.    Roughly.

18        Q.    Okay.  So that's 20 hours.  So it's your

19   testimony today that you spend as much time

20   researching for this lawsuit as you do at your work

21   with Masterpiece?

22        A.    No.  It's the amount of time I would have

23   been spending to -- my artwork and the beekeeping.

24        Q.    Okay.  So then let me ask you this then.

25   It's the amount of time that you would have been

Page 82

1    spending with your beekeeping.  How does this

2    lawsuit stop you from doing that?

3        A.   Because I have to focus on the court

4    procedures.

5        Q.   Okay.  But then you just said that you

6    weren't spending all of that time researching.  So

7    what were you doing in lieu of the beekeeping?

8        A.   So I had my day job at Masterpiece

9    Flowers.

10       Q.   Okay.

11       A.   Those hours can vary from day to day.

12       Q.   Okay.

13       A.   Okay.  Instead of going and doing the

14   beekeeping I'm having to do the research for the

15   lawsuit.

16       Q.   Okay.  So you're spending five hours, four

17   days a week -- you're spending 20 hours a week doing

18   legal research?

19       A.   Estimated, yes.

20       Q.   Okay.  Where are you doing legal research?

21       A.   At home.

22       Q.   Through what mechanism?

23       A.   My computer.

24       Q.   Okay.  What websites?

25       A.   Oh, I have no idea.  Department of

Page 83

1    Justice.

2         Q.   What are you looking at through DOJ?

3         A.   It's been a while since I've looked at

4    that one, so I don't remember.

5         Q.   Well, DOJ doesn't have case law, so I'm

6    curious as to what you're looking at.

7         A.   Okay.  I know I look at case laws, but I

8    don't remember exactly the exact website.

9         Q.   Okay.  So what are you researching then

10   for 20 hours a week?

11        A.   Well, I do look at Kentucky Revised

12   Statutes.

13        Q.   Okay.  Well, this is a federal lawsuit.

14        A.   Yeah.

15        Q.   So Kentucky Revised Statutes are not going

16   to control here.  So what else are you looking at?

17        A.   Well, the Kentucky Revised Statutes do

18   account for the citation and the definitions.

19        Q.   Okay.  So have you researched then

20   189.290?

21        A.   That's the -- yes.

22        Q.   Okay.  What other KRS provisions are you

23   researching?

24        A.   There's the one I mentioned earlier where

25   the sheriff is accountable for his deputies'

Page 84

1   actions.

2        Q.   Okay.  So that's two statutes.  What other

3   statutes are you looking at?

4        A.   There's definitions.

5        Q.   Okay.

6        A.   Going through definitions of the Kentucky

7   code and Kentucky statutes.  Definitions located in

8   Black's Law Dictionary.  And then definitions within

9   the federal court cases.

10       Q.   Okay.  So if you have 1,240 hours that

11  you're claiming have been diverted with these

12  lawsuits and according to the affidavit you filed

13  with district court you've spent six hours, so

14  that's 1,234 hours of legal research for the civil

15  lawsuit that's remaining.

16            So if you are doing 20 hours per week, so

17  that's 61 weeks -- 61.7 weeks that you've been

18  working.  So there are 52 weeks in a year?

19       A.   Yes.

20       Q.   Okay.  So you've been for about a year and

21  two or three months working -- is it your testimony

22  that for a year -- one year and two or three months

23  every week, week after week, you are doing legal

24  research on this case?

25       A.   I don't know if it's exactly 20 hours.

Page 85

1          Q.    Okay.

2          A.    It might be a little bit more, it might be

3     a little bit less.

4          Q.    Okay.  So aside from -- I believe there

5     was a complaint and an amended complaint?

6          A.    Yes.

7          Q.    Okay.  What other documents are you trying

8     to draft for which you are required to do research?

9          A.    Well, there's -- pretty much everything

10    that's been filed.

11         Q.    Okay.

12         A.    A motion to compel.  Making sure that is

13    properly worded and aligned with the federal rules.

14    So there's that that I have to look for, the federal

15    rules.  Trying to anticipate what I should be doing

16    next.

17         Q.    Okay.  So then would you agree that it is

18    mostly just trying to navigate a federal court that

19    is requiring this amount of time?

20         A.    Yes.

21         Q.    Okay.  You testified earlier that it's

22    also learning the statutes, but is it also fair that

23    you had to learn the statutes to defend yourself in

24    the criminal district court case?

25         A.    Yes.

Page 86

1        Q.    Okay.  So why did it only take you six

2   hours there, but it's taking you 1,234 hours here?

3        A.    Because on the bill of costs that I

4   submitted, it was a little estimate.  I kept less

5   track of time.  And I had other things going on in

6   my life.  I probably could have put something more,

7   but. . .

8        Q.    So this bill of costs that you submitted

9   that were certified as correct was just an estimate?

10       A.    Yes.

11       Q.    So you don't have any kind of

12  documentation to actually support the hours that you

13  claimed here?

14       A.    That's correct.

15       Q.    Okay.  In your affidavit with this

16  beekeeping -- so you've been doing beekeeping since

17  you said 2018?

18       A.    Yes.

19       Q.    Why did this citation in 2023 stop you

20  from devoting an additional 1,240 hours of time when

21  you had never expended that type of time in years

22  prior; what made 2023 special?

23       A.    So in the past few years I've either moved

24  around or had put my focus towards the Masterpiece

25  Flower Company attempting to get more hours there.

Page 87

1          Also, it -- having to attempt to find

2    people to speak to at -- farmers as to places I can

3    -- it's mostly what was restricting me before is

4    finding places to put the bees.

5          Q.   Do you currently have a list of places

6    that you can put more bees?

7          A.   There was one place that I asked them

8    about before.  I don't remember the exact name.  But

9    there's a farm up in Hebron that does apples and

10   blueberries and whatnot.  I don't remember the name.

11         Q.   Earlier when I asked you about how many

12   hives you have now and how many you can have in your

13   current -- I guess the farm -- the friend's farm

14   that you use --

15         A.   Yeah.

16         Q.   -- you testified that you had three and

17   you can build up to ten; do you recall that?

18         A.   I think -- so I have ten hives currently

19   built.  Only three are active with actual bees in

20   it.  The others are empty.

21         Q.   Okay.  So then you would agree you

22   actually don't need to expend any additional time

23   building the hives, you just need to maintain them?

24         A.   Well, I believe I said I was going to go

25   to about 20 hives.  So there's an additional 10 I

Page 88

1    need to build and then also buy bees and maintain

2    them.

3        Q.   But you don't have actually a definitive

4    place to house those additional 10 hives, correct?

5        A.   For the hives 10 -- let's say 11 through

6    20, all right, no, I don't.

7        Q.   Okay.  So earlier when I asked you about

8    your beekeeping venture and you said that you have

9    to build the hives and then you have to physically

10   go inspect the hives, but that only occurs about two

11   to three times per month?

12       A.   Yes.

13       Q.   How does --

14       A.   Well --

15       Q.   Sorry.  Go ahead.

16       A.   Well, that's with the current hives I

17   have.

18       Q.   Okay.

19       A.   Of just three.

20       Q.   Would you have to add additional days of

21   inspection if you have 10 versus three hives?

22       A.   Yes.  Definitely.

23       Q.   Okay.  What is included in an inspection?

24       A.   When the hive is as full as possible, you

25   have to look through, one, the brood pattern and

Page 89

1   make sure the queen is laying the eggs properly,

2   because there's certain signs that could show that

3   the queen could be old or not laying as many eggs as

4   she could.  And then you have to take certain

5   techniques to either replace her by buying a new

6   queen or try to raise a new queen within that hive.

7            I was looking for varroa mites, which you

8   have to treat for with something called oxalic acid

9   and formic acid, which is a vapor.  That has to be

10  done during specific times of the year under

11  specific weather conditions for it to be proper.

12           They also have diseases such as foulbrood.

13  And then there's another disease -- I can't remember

14  what it's called, but you have to test for that by

15  pretty much taking the little larvaes and inspecting

16  them by appearance.  And that's mostly what I would

17  have been doing.

18       Q.   Okay.  About how long does it take per

19  hive?

20       A.   That can kind of vary.  I usually end up

21  doing a hive within an hour, so. . .

22       Q.   Okay.  And your hives, are they kept

23  relatively close; you can just walk over to the next

24  one?

25       A.   For the three that I have now, yes.

Page 90

1    They're all at the same location.

2        Q.    Okay.  How does that vary if you have

3    more?

4        A.    Well, if I had the 20 hives as I was

5    attempting to go to, one, I'd have to be traveling

6    to different properties, so that takes time to do

7    and -- I mean, if you're spending an hour at each

8    hive for 20 hives, it's, what, 2,000 hours.

9        Q.    Okay.  So in this time capacity

10   calculation you have estimated approximately eight

11   hours of available productive time each day; is that

12   correct?  And I got that by -- so 24 hours in a day.

13       A.    Uh-huh.

14       Q.    You subtract ten hours a day for sleep,

15   two hours for meals, two hours for chores, and two

16   hours for miscellaneous needs per day.  That leaves

17   you with eight.

18       A.    Oh, it does.  Okay.

19       Q.    So if you have eight hours in a day --

20       A.    Uh-huh.

21       Q.    -- so that's during, let's say, the given

22   working week.  So that's a 40-hour workweek,

23   correct?

24       A.    Yes.

25       Q.    Okay.  So you have 40 hours of available

Page 91

1    productive time during any given Monday through

2    Friday workweek.  Twenty of those are spent with

3    Masterpiece, correct?

4         A.    Yes.

5         Q.    Okay.  So that leaves 20 hours in a given

6    workweek for that, okay?

7         A.    Okay.

8         Q.    So you testified earlier that you have 20

9    hours at least of research, right -- so is it your

10   testimony that you are doing no artwork right now?

11        A.    That's correct.  That was going to be my

12   next point is that I'm not doing artwork either.

13        Q.    Okay.  Is it your testimony that you are

14   doing no beekeeping right now?

15        A.    That's correct.

16        Q.    Okay.  So what are your hives doing; who

17   is taking care of them right now?

18        A.    No one.

19        Q.    Okay.  So where does that leave them; what

20   does that mean for them?

21        A.    I mean, I'm doing the very minimal to keep

22   them -- right now I do know that they probably have

23   a bunch of hive beetles, which tends to eat the food

24   the bees need.  And varroa mites, which is a

25   parasite, like a large tick, which -- I mean, having

Page 92

1    a large tick on you for your life is just going to

2    kill you, so eventually it will lead to a colony

3    collapse.

4        Q.    Okay.  So you said you're doing very

5    minimal, though.  What does minimal entail?

6        A.    So minimal is just going over, seeing that

7    they're laying eggs that have a queen.  And I plan

8    on when the weather -- when the weather cooperates,

9    plan on doing the oxalic acid to kill off the mites.

10   Hopefully that will be this month.

11       Q.    Okay.  So the remaining 20 hours of your

12   week that is spent entirely for legal research, you

13   said you're doing on your computer, correct?

14       A.    Yes.

15              MS. AMLUNG:  Okay.  So I am going to

16              as permitted under the rules make a formal

17              request for your Internet search history

18              so that I can see what websites you are

19              going to be looking at and where the legal

20              research is going to be conducted in

21              support of this affidavit.

22              I'll submit the formalized document

23              later, but per the rules I'm allowed to

24              make that request during discovery, okay?

25              MR. SPENCER:  Okay.

Page 93

1              MS. AMLUNG:  Okay.  So please produce
2         that to us within standard discovery.  I
3         think it's 30 days under the rules, okay?
4              MR. SPENCER:  Can you show me an
5         example of what kind of thing you're
6         looking for so I can provide it with
7         accuracy?
8              MS. AMLUNG:  Well, I'm going to ask
9         for your search history on your Internet.
10             MR. SPENCER:  Okay.
11             MS. AMLUNG:  Because you couldn't
12        tell me where you're doing the legal
13        research and you have to provide the
14        supporting documentation.  And if you're
15        spending 20 hours a week doing legal
16        research online, your Internet history
17        should show that.
18             MR. SPENCER:  Okay.
19  BY MS. AMLUNG:
20      Q.   Okay.  So in addition to the beekeeping
21  venture that you claim that you have lost 1,240
22  hours of dedicated time, you also talk about artwork
23  income potential.
24      A.   Yeah.
25      Q.   So here's where I'm confused, because

Page 94

1    according to your calculation of just the sheer

2    number of time that you have available in a day, all

3    of that time is taken up with beekeeping per your

4    calculation of approximately 20 hours a week.  So

5    when do you do artwork?

6         A.   Oh, you know, I might have misstated the

7    20- -- the 120 hours is like for both beekeeping and

8    art.

9         Q.   Oh, okay.

10        A.   I believe that's -- that might have been a

11   misstatement.

12        Q.   Okay.  So this is why we're going through

13   this now, because the math is -- it's hard

14   sometimes.

15        A.   Yeah.

16        Q.   Okay.  So then if it's not 100 -- or 1,240

17   hours of beekeeping time, it's 1,240 hours of

18   beekeeping and artwork?

19        A.   Yes.

20        Q.   Okay.

21        A.   That's what it should -- and I might have

22   misstated.

23        Q.   Okay.  So about how much time a month in

24   2022 did you devote to artwork?

25                  MR. SPENCER:  Well, I'm going to

Page 95

1            object as it's speculation.

2       A.    But I also don't remember.

3       Q.    Okay.  Can you ballpark at all how much

4  time you spent?  I mean, I'm not going to hold you

5  to a definitive number, but we do need to get some

6  estimates.

7       A.    I -- I don't think I can even do a

8  ballpark.

9       Q.    Okay.  So you create artwork, which is

10 consigned and sold through the WitchLab in Columbus.

11 That's what this affidavit says.  Tell me about your

12 relationship with the WitchLab.  How did you get

13 hooked up with them?

14      A.    They did a small event in Columbus that I

15 attended.  And about that time they were going to be

16 opening a brick and mortar store.  And they informed

17 me that they will be doing consignment, so that's

18 how.

19      Q.    Okay.  So when did you attend the small

20 event in Columbus?

21      A.    I know it was like October I think 2018 or

22 2019.

23      Q.    Okay.  So you've been communicating with

24 them for years; is that fair?

25      A.    Yes.

Page 96

1      Q.    Okay.  When did you start selling with

2    them?

3      A.    At the brick and mortar store, I'd have to

4    look at the contract to get the exact date, but I

5    believe it was either December of 2018 or January of

6    2019.

7      Q.    Okay.

8      A.    Maybe February.

9      Q.    Okay.  Do you make artwork and take it to

10    them for display, or do people come commission your

11    artwork through them?

12      A.    I usually take it to them.

13      Q.    Okay.

14      A.    There's the occasion where people will

15    commission.

16      Q.    Okay.

17      A.    Yeah.

18      Q.    Okay.  What does a normal artwork piece

19    look like?

20      A.    So I'm mostly focused on osteology, which

21    is the study of bone.  So I'm assembling the

22    skeleton of an animal.  Kind of like what you would

23    see dinosaur skeletons in museums.  It would be like

24    that.

25      Q.    Okay.  Of what kind of animals?

Page 97

1        A.    Pretty much your game animals that can be

2    legally harvested, like raccoon.   Sometimes you got

3    people's pets.   They'll have their pet cat done or

4    their pet dog.   Snakes, lizards.

5        Q.    About how long does an average project

6    take you?

7        A.    Well, it kind of varies on the animal.   A

8    snake takes a lot longer than a cat.

9        Q.    So how long would it take for you to

10   create a snake piece?

11       A.    It kind of depends on the snake -- size of

12   the snake.   So smallest -- I can't even really say,

13   you know.   I don't keep records of exact hours when

14   I do it.

15       Q.    Okay.   Does it take you a day, does it

16   take you a week?

17       A.    For the -- again, it depended on the size

18   and the position of the snake.   It could vary from

19   two or three weeks to -- yeah, to do the skeleton.

20   Plus, there's also the display case for it, so

21   that's woodworking I've got to do.

22       Q.    About how much does each of your pieces

23   sell for?

24       A.    It depends.   Again, it ranges from 200 to

25   800 -- actually, I had -- I think the highest one I

Page 98

1   sold was 750.

2        Q.   Okay.  So looking at the artwork income

3   potential section, it looks like your PayPal records

4   show $1,551 in 2023.  Is that two projects, three

5   projects, four?

6        A.   I have no idea.

7        Q.   Okay.  So these PayPal receipts that you

8   attached onto your affidavit, is this all from the

9   WitchLab?

10       A.   Yes.  So she was having some leasing

11  issues she had to focus on.  And she said she can

12  only -- at the time I asked her -- the WitchLab

13  is -- she was going to just submit the PayPal stuff.

14  So I don't know if she has different records in a

15  different book.

16       Q.   Oh, this is Square, isn't it?

17       A.   Yeah.  There's that -- there's Square and

18  there's PayPal.

19       Q.   Okay.  So I guess where I'm struggling is

20  that, you know, in this artwork income potential

21  section, you know, you have said that your PayPal

22  records indicate $307.50 in 2025, but the January 1

23  to December 31, 2025, record here says a sale of

24  $3,400.

25       A.   I'm sorry.  Can you repeat --

Page 99

1      Q.    Sure.  I'm just trying to ascertain --

2      A.    Just go over it again a little bit slower.

3      Q.    No, you're fine.

4      A.    So which one was it?

5      Q.    You're fine.  So I'm looking at, you know,

6   these records -- the Square records on the back.

7   And I'm trying to figure out what matches up with

8   what.

9      A.    Okay.

10      Q.    So you've said you have artwork income

11   potential?

12      A.    Yes.

13      Q.    But then you also talk about these sales

14   through like festivals and things of that nature.

15   So is it fair that these Square records that are

16   attached to your affidavit are only your personal

17   sales through the Square app and do not include

18   WitchLab?

19      A.    Yes.  That's correct.

20      Q.    Okay.

21      A.    So the sales on the Square app is what I

22   made at festivals and does not include anything from

23   the WitchLab.

24      Q.    Okay.  So then these numbers here is your

25   income.  So that's minus the Square fees, which is

Page 100

```
 1    what comes to this bottom number.  So, for example,

 2    in 2025, $3,300 -- or $3,352.30?

 3         A.    Which --

 4         Q.    So I'm looking at the 2025 Square.

 5         A.    Okay.

 6         Q.    It says $330- -- 3,352.30?

 7         A.    Yes.

 8         Q.    And that's how much you've sold at

 9    festivals?

10         A.    Yes.

11         Q.    How many festivals have you gone to this

12    year?

13         A.    Maybe one or two.  I think one.  But I

14    can't really remember for sure.

15         Q.    Okay.  When was that festival?

16         A.    February, I believe.

17         Q.    Where was it?

18         A.    I believe it was Louisville, Kentucky.

19         Q.    What festival was it?

20         A.    It's a show called Oddities & Curiosities.

21    Yeah, Oddities & Curiosities.

22         Q.    Was that Oddities & Curiosities?

23         A.    Yeah.

24         Q.    Okay.

25         A.    It says something else at the end.  I
```

1    can't remember what it was.  It's Oddities &

2    Curiosities Expo.  That's it.  Because there's one

3    that sounds similar but that says World Market or

4    something like that.

5         Q.   Okay.  So you sold $3,300 -- or I guess

6    you netted $3,300 at that festival from one day, or

7    was it a multi-day festival?

8         A.   I believe that's just one day.

9         Q.   Okay.  Did you have to travel?

10        A.   Yes, I traveled.

11        Q.   Okay.  Did you stay overnight somewhere?

12        A.   I did not pay for a hotel.

13        Q.   Okay.  Well, I mean, did you stay

14   overnight, though?

15        A.   Down in that area, yes.

16        Q.   Okay.  But you had time to do that even

17   with this lawsuit ongoing?

18        A.   Yes.

19        Q.   Okay.  Why did you make less in 2025 than

20   you did in 2024; is there a particular reason, did

21   you go to less festivals, did you just -- you know,

22   not a great sale year?

23        A.   Because I went to less festivals because I

24   knew I would be doing the court-related stuff.

25        Q.   Okay.  How many festivals did you go to in

1    2024?

2         A.   I believe -- I believe three.

3         Q.   Three.  Okay.  So you filed this lawsuit

4    in 2024?

5         A.   Yes.

6         Q.   Okay.  Which means you did all of the

7    research before you filed, correct?

8         A.   Define all of the research.

9         Q.   Okay.  Well, you had to do at least enough

10   research to draft a complaint, right?

11        A.   Yes.

12        Q.   Okay.  And you responded to

13   interrogatories this year.  But when did you

14   actually defend yourself in the criminal case; that

15   was in 2024 as well, correct?

16        A.   Yes.

17        Q.   Okay.  So how did you have time to go to

18   more festivals in 2024 than you do this year in

19   2025?

20        A.   Well, I was putting less time into the

21   court stuff.  Also, I already made financial

22   commitments for the spots, though, so it's like a

23   one-day thing, so I. . .

24        Q.   But you were able to find the time to do

25   that in 2024, correct?

1     A.   Yes.  Also, I had artwork that was already

2  finished.  It was just sitting on the shelves,

3  so. . .

4     Q.   Okay.

5     A.   I didn't actually have to build anything.

6     Q.   Okay.  So in 2023 you made $11,000 at

7  festivals; do you see that?

8     A.   Yeah.

9     Q.   It's on page four.  Okay.  What was the

10 difference between 2023 and 2024; why less

11 festivals?

12    A.   Well, in 2023 I think I did the same

13 amount as 2024.

14    Q.   Okay.

15    A.   Maybe one more.

16    Q.   Okay.  So the fluctuation of --

17    A.   Are you talking about why -- you're

18 talking about why less income?

19    Q.   Uh-huh.

20    A.   Oh.  Just probably depending on the pieces

21 I was selling.

22    Q.   Okay.  So in 2022, though, you made only

23 $6,000?

24    A.   Yes.  That's. . .

25    Q.   What's the differentiation between 2022

Page 104

1    and 2023?

2        A.    Just the amount that I was building up.

3    But also, the shows in 2023 were mostly during the

4    earlier months where I believe the court cases were

5    in the fall and winter in the criminal case when I

6    didn't have festivals.

7        Q.    Are there festivals that go on all year

8    round?

9        A.    You mean like a single festival all year

10   round?

11       Q.    No.  Like, I mean, the festivals, they're

12   not seasonal; there's not I only go to festivals in

13   the summer?

14       A.    Oh, no.  Yeah.  So the Oddities &

15   Curiosities Expo, they'll do a show every month but

16   in different states.

17       Q.    Okay.  Do you travel to each of those

18   different states?

19       A.    I've done Ohio, Pennsylvania, Kentucky,

20   and Indiana, but not all -- it will vary from year

21   to year.

22       Q.    So you only did the one in Kentucky this

23   year?

24       A.    From what I recall, yes.

25       Q.    Okay.  Are you registered or signed up to

1    go to any more festivals for the remainder of the

2    year?

3        A.    No.

4        Q.    Okay.  Why not?

5        A.    Because I know I'm going to have to

6    dedicate that time to court.

7        Q.    Okay.  What do you anticipate having to

8    dedicate your time to do?

9        A.    Learn more laws.  Learn more about

10   procedures.  Learn the maxims of the laws.  But now

11   there's a study group when we get together and we

12   just research like -- well, right now we're doing

13   maxims of law.  And then next we'll be doing court

14   procedures.

15       Q.    Okay.  Study group -- what study group?

16       A.    They just call it the jurisdiction group.

17       Q.    Okay.  Where did you find this group?

18       A.    On social media.

19       Q.    Okay.  Where on social media; was it like

20   an actual group on Facebook or did you see a meeting

21   notice?

22       A.    It was -- yeah.  It was a Zoom invite.

23       Q.    Okay.  How did you get connected with this

24   group?

25       A.    Through a friend.

Page 106

1    Q.   What's the friend's name?

2    A.   Cameron Wilson.

3    Q.   Cameron?

4    A.   Yes.

5    Q.   Did you talk to Cameron Wilson about your

6    current lawsuit?

7    A.   I don't think so.

8    Q.   Okay.  Then how did this come up in

9    conversation?

10   A.   I know he was doing lawsuits -- well, I

11   should rephrase that.  He was learning laws himself,

12   because he had citations and was going after certain

13   1983 cases himself.  I might have just said, hey, I

14   got -- I got something, but I didn't speak about

15   specificities about this case.

16   Q.   Is this the first 1983 case that you

17   filed?

18   A.   Yes.

19   Q.   Okay.  What made you decide to file it?

20   A.   Just listening to what Cameron talked

21   about inspired me.

22   Q.   Inspired you how?

23   A.   That I should stand on my rights when

24   there's a constitutional violation.

25   Q.   Okay.  How did it come up in conversation

1   with him?

2        A.   So with him it actually -- he has a

3   YouTube.  So I mostly watched his YouTube and then

4   contacted him.

5        Q.   Okay.  How did you find his YouTube?

6        A.   Just -- I think it popped up, just, you

7   know, one of those YouTube stations.

8        Q.   In one of those what?

9        A.   A YouTube suggestion type of thing.

10        Q.   Okay.  Do you normally watch YouTube

11   videos about suing the government?

12        A.   No.

13        Q.   Okay.

14        A.   Not before this case.

15        Q.   Okay.  What kind of things would you watch

16   on YouTube then?

17        A.   Beforehand I was watching medical type of

18   YouTubes where there's some doctors talking about,

19   you know, what happens when you go under anesthesia

20   or different pathologies and such.

21        Q.   Okay.  Is Cameron a local person?

22        A.   No.  He's in -- I think he's in Washington

23   State.

24        Q.   Okay.  So you see his YouTube videos and

25   you reach out to him and say, hey, tell me more

1    about this?

2        A.    No.  I mean he talks a lot on his YouTube,

3    so I'm not even -- now that I really think about it,

4    I'm not really sure if I mentioned much of this.

5        Q.    Did you have any assistance drafting any

6    of these things from him?

7        A.    No.

8        Q.    Okay.  Does he provide forms or anything

9    like that that says, hey, if you're going to do

10   this, this is the general structure of what this

11   needs to look like?

12       A.    He did not provide any forms.

13       Q.    Okay.  About how many of his videos have

14   you watched?

15       A.    Maybe a dozen, maybe less.  Probably less.

16       Q.    How long are his videos?

17       A.    I don't recall.

18       Q.    Okay.  Are his videos and the time you've

19   spent watching them a part of the 1,236 hour -- or

20   34 calculus that we discussed?

21       A.    In part.

22       Q.    Okay.  So I do really want to drill down

23   into this 1,200- -- I'm sorry, 1,234 hours.  You've

24   said a lot of legal research.  So can you really

25   describe in detail what it is that you're doing

1   during these hours?

2       A.   I know I spend probably about six hours on

3   the Zoom meeting where we have the study group.  And

4   we just talk about the laws in general.  You know,

5   no different than what a college study group would

6   be like.  What else. . .

7       Q.   So it's not necessarily specific to this

8   case, it's generalized legal procedure?

9       A.   Yes.  But it can be applied to this case.

10      Q.   How so?

11      A.   Yeah, I'm not too sure yet.

12      Q.   Okay.  So we've gone through beekeeping

13  potential, artwork -- and artwork potential.  So

14  let's -- you've labeled these as potential.  Okay.

15  Would you agree that as we sit here today you do not

16  currently have the infrastructure in place to

17  actually expend 1,240 hours beekeeping?

18      A.   That would -- I -- as of today I would not

19  be able to go to a person's farm and have their

20  permission to put the bees on.

21      Q.   Okay.  For the artwork, what is it your --

22  or what is your testimony that you should actually

23  be making now but cannot be making because of this

24  lawsuit?

25      A.   Like how many projects I should be doing?

1       Q.   Yes.

2       A.   In the past I know I could do four cat

3  skeletons within a week or two.  And that's just the

4  skeleton.  It doesn't include the cases.  Well,

5  if -- you know, I will say cat-size skeleton, so it

6  could be a fox.  It could be a raccoon.

7       Q.   Looking at your sales how many projects

8  were you doing in 2022 compared to 2023 when you

9  were first cited for reckless or careless driving?

10      A.   Pretty much after I was done with

11  Masterpiece Flowers I'd go home and work on that --

12  on my artwork if I wasn't doing the beekeeping kind

13  of stuff and -- I mean, I do that until bedtime

14  pretty much.

15      Q.   Okay.

16      A.   So. . .

17      Q.   So if you have 40 hours of free time left

18  in the day [sic], half of that goes to Masterpiece;

19  so about four hours per day?

20      A.   I'm sorry.  Can you rephrase that?

21      Q.   Sure.  We talked earlier that based on

22  your time capacity --

23      A.   Yes.

24      Q.   -- you have about eight hours of time a

25  day that's not expended on food, personal needs --

Page 111

1      A.   Right.

2      Q.   -- sleeping?

3      A.   Right.

4      Q.   So if 20 hours a week is at Masterpiece,

5    that's 20 hours remaining of that, so about four

6    hours a day?

7      A.   Okay.

8      Q.   Is that fair?

9      A.   Okay.

10      Q.   So four hours a day that's left that you

11    were making four or so cat-size skeletons per week

12    and their cases plus beekeeping back in 2022?

13      A.   Well, it was the cat skeletons without the

14    cases.

15      Q.   Okay.

16      A.   And then -- but pretty much, yes.

17      Q.   Okay.  Would you agree that in 2022 you

18    were at full capacity with your time between art and

19    beekeeping?

20      A.   By full capacity do you mean using up all

21    my time?

22      Q.   Yes.

23      A.   Probably not.

24      Q.   Probably not?

25      A.   Yeah.

Page 112

```
1        Q.   Okay.  What were you doing then in the
2   other hours of the day?
3        A.   I'm not too sure.
4             MR. SPENCER:  I'm just going to
5             object to it because I think that's
6             speculation.
7             MS. AMLUNG:  It's not speculation.  I
8             mean, it's what you were doing with your
9             life.
10            MR. SPENCER:  Yeah, but you don't
11            remember every single second of your day.
12            MS. AMLUNG:  Okay.  So then I can ask
13            it this way then.  Let me ask it this way.
14            MR. SPENCER:  Okay.
15   BY MS. AMLUNG:
16        Q.   So it's your testimony that you were not
17   using your full capacity of time prior to your
18   interaction with Deputy Ganshirt.  So my question
19   is, why are all of your damage calculations based on
20   a full capacity use of your time when you had not to
21   date been doing that?
22        A.   Yeah, I'm a little confused, so. . .
23        Q.   Okay.  Let me see if I can --
24        A.   I'm feeling confused.  I'm sorry.
25        Q.   Okay.  That's okay.  You don't need to
```

1    apologize.  So you have provided this affidavit --

2         A.   Right.

3         Q.   -- that breaks down every hour of your day

4    and how much time you're spending doing various

5    things that -- life-sustaining things, and you've

6    come up with this calculus that you have eight hours

7    remaining in your day that are not devoted to sleep,

8    eating, miscellaneous needs, and chores, okay?  So

9    that's a 40-hour workweek to essentially make money

10   --

11        A.   Right.

12        Q.   -- okay?  You testified that you have been

13   consistently employed since 2018 with Masterpiece at

14   a 20-hour workweek, correct?

15        A.   Yes.  Yes.

16        Q.   Okay.  So that leaves 20 hours of time of

17   capacity for you to make money in your 40-hour

18   workweek --

19        A.   Okay.

20        Q.   -- okay?  Through beekeeping and artwork?

21        A.   Yes.

22        Q.   Okay.  You just testified to me that you

23   were not expending prior to your interaction with

24   Deputy Ganshirt the full 20 hours to do things

25   related to beekeeping and artwork, correct?

Page 114

1          A.    In relation to -- you said in 2022,

2     though?

3          Q.    Yes.  So prior to your interaction with

4     him --

5          A.    I mean, possibly.  Yeah.

6          Q.    Well, no.  I mean, that's what you just

7     told me is that you were not using the full 20 hours

8     to devote to beekeeping and artwork.  So what were

9     you doing --

10         A.    Yeah, I think maybe I misunderstood the

11    question --

12         Q.    Okay.

13         A.    -- the previous question that led up to

14    this.

15         Q.    Okay.  So then --

16         A.    So --

17         Q.    -- let me ask a little --

18         A.    -- I mean --

19         Q.    -- let me try to be a lot clearer then,

20    okay?

21         A.    Okay.

22         Q.    So prior to your interaction with Deputy

23    Ganshirt --

24         A.    Right.

25         Q.    -- you have 20 hours of the week that are

Page 115

1    not devoted to life-sustaining things --

2         A.    I got that part, yeah.

3         Q.    Okay.

4         A.    I got that part.

5         Q.    Okay.  So with your 20 hours a week how

6    much of your time prior to your interaction with

7    Deputy Ganshirt were you spending beekeeping?

8         A.    Again, that was -- it's speculative,

9    because I don't -- I've never kept consistent

10   records.

11        Q.    Okay.  Then let me ask it a different way.

12   Let me ask it a different way, okay?  Do you do

13   anything socially; do you have friends that you go

14   hang out with during the week?

15        A.    No.

16        Q.    Okay.

17        A.    I mean, I don't go out and socialize.

18   I've got friends that I socialize with on like

19   Facebook.

20        Q.    How much do you spend on Facebook

21   socializing each week?

22        A.    Oh, I have no idea.

23        Q.    Okay.  How much time do you spend on

24   Facebook per day?

25        A.    Maybe an hour.

1      Q.    Okay.

2      A.    Maybe.

3      Q.    Do you watch TV?

4      A.    No.

5      Q.    Do you watch YouTube videos?

6      A.    Not really anymore.  I mean, if it's

7  something I feel is legally relevant, something I

8  could learn from, then, yeah, I'll watch it,

9  but. . .

10     Q.    Well, you testified earlier that the way

11  that you found this --

12     A.    Yeah.

13     Q.    -- study group was through a suggested

14  YouTube video because you were watching other

15  medical-related YouTube videos.  So about how much

16  prior to your interaction with Deputy Ganshirt were

17  you spending on YouTube watching those types of

18  videos or other types of videos?

19     A.    No idea.

20     Q.    Okay.  But you would agree that you were

21  expending at least some quantity of time doing that

22  each week?

23     A.    Yes.

24     Q.    Okay.

25     A.    And that -- that in the affidavit should

1    fall underneath miscellaneous time.

2         Q.   So that falls under miscellaneous needs?

3         A.   Oh, did I put needs?

4         Q.   Yes.

5         A.   Yeah, it should probably have said

6    miscellaneous time.

7         Q.   Okay.  So then what does miscellaneous

8    time entail; what are those two hours to you?

9         A.   Random things like going to the bathroom,

10   spending five minutes doing something on Facebook

11   maybe.

12        Q.   Okay.  So is it your testimony that your

13   socialization time on Facebook also is included in

14   miscellaneous needs?

15        A.   Yes.

16        Q.   Okay.  So then it is your testimony then

17   prior to your time -- or, I'm sorry, prior to your

18   interaction with Deputy Ganshirt that you spent at

19   least four hours every Monday through Friday working

20   on artwork and beekeeping?

21        A.   That I spent four hours. . .

22        Q.   You spent 20 hours a week doing those

23   things collectively?

24        A.   I'm sorry, what was the four hours in

25   relation to?

Page 118

1          Q.    That was the four hours each day that we

2     calculated was remaining, but it's 20 hours a week.

3          A.    Okay.  Gotcha.  Can you just repeat the

4     question as you did?

5          Q.    Sure.  It's your testimony then prior to

6     your interaction with Deputy Ganshirt you were

7     spending 20 hours a week working on artwork and

8     working on beekeeping?

9          A.    Yes.

10         Q.    Okay.  So prior to your interaction with

11    Deputy Ganshirt would you agree then -- because that

12    is the maximum amount of time that you have -- year

13    2022, which was the last full calendar year where

14    you did not have to interact with the Boone County

15    Sheriff's Department, that this would have been

16    about your maximum for funds that you could have

17    made?

18         A.    Potentially.

19         Q.    Okay.  So the $6,000 in 2022 that you made

20    through --

21         A.    Which page are you on?

22         Q.    Oh, I'm sorry.  Page four.  But I'm going

23    to flip around a little bit.  So the 6,330 in 2022

24    that you spent at festivals -- this is your Square

25    receipts --

1        A.    Yeah.

2        Q.    -- okay, plus -- well, we don't actually

3   have any records from WitchLab in 2022.  Why don't

4   you have any records from WitchLab in 2022; were you

5   not working with them then?

6        A.    Did you not -- did I send you the

7   affidavit from WitchLab that has the PayPal?  I

8   mean, I did the PayPal.  But they sent the same as

9   what I've got.

10        Q.    So you have here in your artwork income

11   potential PayPal records showing 1,551 in 2023 and

12   then you have '24 and '25?

13        A.    What -- I'm sorry.  What number is that?

14        Q.    So you're on page three.

15        A.    Okay.  Okay.

16        Q.    So there are no records for 2022 there for

17   WitchLab.  Were you not working with WitchLab at the

18   time?

19        A.    I was, but I don't think they had -- at

20   least the PayPal record does not go back before

21   2022.

22        Q.    Okay.

23        A.    At least that I could tell.

24        Q.    Okay.  Would it have been less than you

25   made in 2023?

Page 120

1        A.    I don't know.

2        Q.    Okay.  Because you say here that your

3    overall art income showed a steady upward trend?

4        A.    Yeah.  It's supposed to be in relation --

5    like overall between the Square sales and WitchLab.

6        Q.    Okay.  So let me just get down to the

7    nitty-gritty here.  In 2022 with your artwork you

8    made 6,000 -- I'm estimating here, I'm not going to

9    get into it, because that will make math way too

10   hard for me to do.  So you made $6,000 in 2022 from

11   generalized art sales.  And there are no PayPal

12   records showing any WitchLab compensation.

13             So based on this document in 2022 when you

14   had absolutely no disruption from the sheriff's

15   department you made $6,000 approximately for your

16   art?

17       A.    From what the records show.

18       Q.    Okay.

19       A.    Yes.

20       Q.    Okay.  Well, that's all I have to operate

21   on, so that's what we're going to go with.

22       A.    Yeah.

23       Q.    For your beekeeping potential it doesn't

24   say anything specifically, but you testified earlier

25   that your beekeeping in past years had only brought

1    in a couple hundred dollars, if that, correct?

2         A.    Correct.

3         Q.    Okay.  So in 2022 you had absolutely no

4    disruption from the sheriff's department, you did

5    not encounter Deputy Ganshirt, you did not encounter

6    anyone.  You testified earlier that in 2023 things

7    started to become problematic for you because of

8    your interaction with Deputy Ganshirt that you lost

9    capacity to make more money; is that correct?

10        A.    Yes.

11        Q.    Okay.  So in 2023, according to this, you

12   made $11,000?

13        A.    Yes.

14        Q.    Okay.  And then you also had the WitchLab,

15   $1,500.  So you almost doubled your income from 2022

16   to 2023 in art; is that fair?

17        A.    Yes.  Well, with the -- it sounds to me

18   like you're making an assumption as to --

19        Q.    I'm not making an assumption.

20        A.    -- time periods --

21        Q.    These are your numbers.

22        A.    -- that the income was made.  The bulk of

23   it would have been made prior to the stop and prior

24   to the court-related stuff.

25        Q.    Sure.  Let me get to --

Page 122

1        A.    But I --

2        Q.    -- the next point --

3        A.    Okay.

4        Q.    -- and I think it will make more sense --

5        A.    Okay.

6        Q.    -- to you.  So in 2022 you made roughly

7    $6,000.  In 2023, which is the year that you were --

8    you encountered Deputy Ganshirt, you made -- let's

9    see -- 11,000 here, plus the 1,500, so roughly

10   12.5 -- so 12,500.  Again, I'm estimating and

11   rounding, I understand that.

12            So in 2024 you made $8,000 -- or $8,00- --

13   8.5.  So 8,520 in 2024 through your festivals, plus

14   the 5,000 with WitchLab.  So you actually made more

15   in 2024 than you did in 2023, your income continued

16   to increase; is this fair?

17       A.    Yes.

18       Q.    So I'm curious about the causation that

19   you're saying the stop with Deputy Ganshirt caused

20   you to lose money, but after your stop you continued

21   to make more that entire calendar following year?

22       A.    It's because I think you made a

23   presumption, because when it comes to taxidermy and

24   the sales, I already had stuff built up to sell.

25   But after the -- because of the stop and court

Page 123

1    proceedings, I wasn't able to dedicate time to my

2    artwork to sell this year.  There's a delay in sales

3    with taxidermy.

4        Q.   Okay.

5        A.   So if I get something today, it might take

6    six to eight months before it's ready to sell.

7        Q.   Okay.  So then let me ask this.  If it's

8    your testimony that the reason you're not making

9    money -- the same amount of money that you were

10   before is because you aren't devoting that -- I

11   guess we decided 20 hours of free time per week to

12   devote to this.

13            Are you following because you're looking

14   at me like you're not following?

15       A.   No.  I'm zoned out now.

16       Q.   Okay.

17       A.   I'm sorry.

18       Q.   Okay.  So you're telling me that you

19   are -- you have this delayed sales, which is why

20   throughout 2024 you were continuing -- able to

21   continue to increase your money that you made,

22   right?

23       A.   Okay.

24       Q.   Okay.  And it's because you no longer had

25   that 20 hours a week to build cases and then do your

Page 124

1    taxidermy projects, correct?

2         A.    Right.

3         Q.    Okay.  But your affidavit also says that

4    you weren't allowed -- or you weren't allowed to

5    reach your full potential in beekeeping because you

6    didn't have the time to go find hives, places, go

7    meet with people, find ways to distribute your

8    honey.

9         A.    Okay.

10        Q.    Okay.  If you were already at capacity for

11   the amount of hours in a day that you could devote

12   to your artwork, how can you also tell me that you

13   had all these extra beekeeping potential hours when

14   there are literally not enough hours in the day for

15   you to have done this additional work?

16        A.    Are you saying my math is wrong?

17        Q.    No.  I'm asking you because your testimony

18   is a little inconsistent.

19        A.    Okay.  My testimony is probably

20   inconsistent because when I write an affidavit, I

21   sit down and think about it, but now I have to think

22   on the fly.

23        Q.    Okay.  But I'm asking questions based off

24   of this affidavit.  So let me try to break it down

25   as simple as I can, okay?

Page 125

1       A.    We might have to break for lunch.

2       Q.    So you had -- I promise you, we're almost

3    done.

4       A.    Okay.

5       Q.    So we have this affidavit where you have

6    testified that you are claiming damages because you

7    have lost 1,240 hours of time that you could have

8    otherwise dedicated to beekeeping?

9       A.    Or artwork.

10       Q.    Or artwork.  That's fine.  So we went

11    through this calculation and we came up with this is

12    based off of -- these numbers that you've calculated

13    are based off the 40-hour workweek, yada, yada,

14    yada, so you have 20 hours each week that you could

15    have been devoting to external income sources

16    besides Masterpiece.  So that's artwork and bees, 20

17    hours a week, okay?

18            So you testified earlier that in 2022 and

19    2023 prior to the traffic stop you were already

20    devoting all the time that you could to your artwork

21    and beekeeping.  You didn't have downtime.  You said

22    all of your time on Facebook, all of your time, you

23    know, on YouTube was included in miscellaneous.  So

24    you have 20 hours a week that you were devoting to

25    artwork and beekeeping --

Page 126

1       A.    Okay.

2       Q.    -- okay?  So then you said all of that

3  transitioned and you lost the ability to do art and

4  to do beekeeping, okay?

5       A.    Right.

6       Q.    Are you following what I'm saying?

7       A.    Yes, I'm good up to now.

8       Q.    Okay.  If you were to not have to dedicate

9  this time to legal research for this lawsuit and the

10  six hours that you did to defend the district court

11  case --

12       A.    Uh-huh.

13       Q.    -- it is your testimony that you would

14  have been able to continue doing exactly what you

15  were doing before, correct?

16       A.    Yes.

17       Q.    Okay.  So if you were already spending at

18  capacity time to build artwork and keep your bees

19  and make the money that you were doing in 2022 and

20  2023, is it fair to say that that is the absolute

21  benchmark for what you would have been making now?

22       A.    No.  So let me make sure I understand this

23  clearly.

24       Q.    Okay.

25       A.    You're asking that the amount that I

Page 127

1   stated would be the highest amount I would have

2   gotten this year?

3        Q.   In so few words, yes.

4        A.   Okay.  I would have to say no, because

5   I -- when doing the taxidermy --

6        Q.   Okay.

7        A.   -- I noticed there was a small trend in

8   customers' preferences as to what was selling more

9   and stuff that was selling slower.  So a lot of

10  people like the snakes.  So I have a lot of snake

11  skeletons right now in a box that need to be

12  assembled, which takes a lot more time than

13  something like a raccoon or a fox.

14       Q.   Okay.

15       A.   Did I answer your question?

16       Q.   No.  So I'm going to continue --

17       A.   Oh, okay.

18       Q.   -- to try to ask it different ways.  Okay.

19  So in your conclusion section of this -- I think

20  this might have just been where I should have

21  started off with.

22       A.   Okay.  Yeah.

23       Q.   In your conclusion section you said you

24  have lost beekeeping income potential of $21,580,

25  okay?

1      A.    Okay.

2      Q.    We'll just go with that, because I'm kind

3  of having a hard time following the conclusion,

4  which is why I think that maybe I should have

5  just --

6      A.    Okay.

7      Q.    -- jumped straight to this.

8      A.    Okay.

9      Q.    So you said you lost beekeeping income

10  potential of $21,580.

11      A.    Okay.

12      Q.    Okay.  So here's my question.  If you were

13  already full on into your artwork, making artwork

14  and spending 20 hours a week doing artwork to

15  sustain your WitchLab, as well as the

16  festival-related art, where in the day do you have

17  the time to also yield this much time, money, and

18  effort in beekeeping?

19      A.    Well, you're referencing time.

20      Q.    Okay.

21      A.    I'm referencing money.

22      Q.    Okay.

23      A.    So the money amount would have to go to

24  the sales of the honey and the sales of the bees.

25      Q.    Sure.

Page 129

1       A.   So let's just make the assumption that I

2   had 20 hives this year instead of doing this

3   lawsuit, that's where you would get the amount,

4   because I could take 20 of the hives and do what's

5   called a split where I give people the old queen and

6   the bees make a new queen and sell that, plus sell

7   honey production.

8       Q.   Okay.  So earlier you testified that you

9   checked the hives two to three times a month, it's

10  about one hour per hive, you'll have travel time to

11  go to wherever your friend's farm is in Batavia, I

12  think, as well as the other locations you

13  anticipated having hives at some point, okay?  Are

14  you with me?

15      A.   I think so.

16      Q.   Okay.  So that's the time that is expended

17  to yield this $21,000 that you're claiming you lost

18  in beekeeping time.  So you're talking money, but we

19  are still talking time as well, would you agree?

20      A.   Maybe I'm misunderstanding, so I want some

21  clarification.

22      Q.   Okay.

23      A.   The $2,100, are you basing that off of the

24  time as if I was being paid by the hour, or are you

25  basing that off of potential sales?

Page 130

1         Q.    No.  So let's keep trying.  Bear with me

2    here.  You testified earlier that for beekeeping

3    it's about an hour to check per hive, you've got

4    three hives now, and you check them about two to

5    three times per month, and that yields at best in a

6    year $200.

7         A.    With what I currently had, yeah.

8         Q.    Correct.  Yeah.  Okay.  So you're saying

9    that you lost beekeeping income potential of

10   $21,000.  If you are expending, let's say, 15 hours

11   a month just to make $200, how are you coming up

12   with this number, because I don't see how there are

13   the hours in the day to get that; do you see what

14   I'm saying?

15            When you factor in how much time you're

16   also saying you lost to make the amount of money

17   that you have for artwork, how can you have those

18   two things in existence together?  Do you understand

19   what I'm asking now?

20        A.    A light bulb did go off for a moment.

21        Q.    Okay.

22        A.    So I think the one issue is inflation,

23   because my past sales -- I was selling at a lower

24   cost.  Now, you know, honey is going to cost a

25   little bit more.  And I was basing that off of -- I

1   think it was the USDA and then some beekeeping

2   articles.  I thought I cited those in here.  Well,

3   again, it's estimated.  Yeah, USDA Department of

4   Agriculture.  It talks about 60 pounds of honey per

5   year.

6        Q.   Okay.  So I'm going to stop you right

7   there for a minute, okay?

8        A.   Yeah.

9        Q.   So, yes, you've cited that USDA says that

10  a single hive in Ohio produces approximately

11  60 pounds of honey per year.  But earlier you

12  testified that your three hives together produced

13  about five pounds per collection in a good year, so

14  that's ten?

15       A.   Well, that's what I harvested.  I wouldn't

16  say that's -- what did I say, five pounds?

17       Q.   Yes.

18       A.   No.  I think I said five gallons.

19       Q.   Five gallons.  Okay.  How is --

20       A.   So gallons -- okay.  So I know a gallon --

21  now, granted honey is denser because it's got

22  sugars.  A gallon of water is eight pounds.  And

23  let's just assume that a gallon of honey is the

24  same.  That would be 40 pounds.  So I would actually

25  be making close to that.  And, again, I was. . .

Page 132

1       Q.   Okay.  So five gallons is 41 pounds.

2   Okay.  Well, if honey is denser, then that would be

3   a little less?

4       A.   No, it would be more because it's denser.

5   You've got more to it, but -- I mean, I. . .

6       Q.   Okay.  I see what you're saying.

7       A.   We'll just go by the weight of water.

8       Q.   Okay.

9       A.   Because it's going to be close.

10      Q.   Then I apologize.  Then that was

11  completely my misunderstanding of pounds and

12  gallons.  I was completely conflating those two.

13      A.   And, you know, I should have answered in

14  pounds earlier.

15      Q.   Okay.

16      A.   I'm a visual person.  So when I'm done

17  harvesting honey, I'd see, hey, how many buckets or

18  how many jars do I have, not -- I don't weigh them

19  all.

20      Q.   Okay.  I mean, even so, though, my

21  question is still -- I still have that question for

22  you, though.  So you said inflation.  And I cut you

23  off.  So please continue with what you were saying

24  with my question of how do you reconcile what you

25  are doing now and how much that is yielding

1    income-wise versus how you're getting these

2    numbers -- the amount of time that goes into what

3    you're making now, how do you rectify -- you don't

4    get additional hours in the day?

5        A.    Right.

6        Q.    So how are you saying that because of

7    Deputy Ganshirt's encounter with you, you do not

8    have the ability to make all of this artwork and

9    this beekeeping when you would not have had enough

10   hours in the day to do it before you encountered

11   him?

12       A.    Oh, you think I didn't have enough time in

13   the past; is that what you're getting to?

14       Q.    Well, because you told me earlier --

15       A.    I'm just trying to make sure I understand.

16       Q.    Yeah.

17       A.    So you're saying I don't have enough time

18   in the past to make what I could have.  Okay.  Is

19   that -- that's the question?

20       Q.    Yes.

21       A.    Okay.

22       Q.    There were not enough hours in the day for

23   you to make this prior to your encounter with Deputy

24   Ganshirt, so how are you saying that there are

25   enough hours in the day for you to do that now?

Page 134

1        A.   I don't think I am saying that because --

2   I mean, it's multi-tasking, you know.

3        Q.   You can make artwork and drive to a hive

4   in Batavia at the same time?

5        A.   No.  But the bees make honey while I'm

6   sitting here talking to you right now.

7        Q.   Well, I know, but we're talking about the

8   time to harvest.  You told me prior to your

9   interactions with Deputy Ganshirt that you were

10  expending the full additional 20 hours of free time

11  per workweek --

12       A.   Right.

13       Q.   -- already on your beekeeping ventures

14  with your three bees and your artwork?

15       A.   Right.

16       Q.   Okay.

17       A.   And planning to grow.

18       Q.   Okay.

19       A.   I don't --

20       Q.   So just to clarify, the amount of time

21  that you're spending now, all of this lost time that

22  you're claiming you cannot devote is legal research

23  to prosecute this civil lawsuit, correct?

24       A.   Yes.

25       Q.   Okay.  And do you have any reason to

Page 135

1    disagree with the bill of costs that you filed in

2    the district court about the amount of time that you

3    expended on the district court defense?

4         A.    What do you mean by do I disagree?

5         Q.    Well, I mean, you filed an affidavit

6    saying that you spent six hours of time researching

7    for that case.

8         A.    Yeah.  That was mostly just drafting the

9    paperwork and the motion to dismiss.

10        Q.    Okay.

11        A.    And the travel time and having to sit

12   there and wait two hours before I'm the last one

13   called.

14        Q.    Well, you filled out the form and it

15   specifically says legal research as well?

16        A.    Right.

17        Q.    So would you agree that based on the

18   affidavit you filed you spent six hours with legal

19   research and otherwise defending the district court

20   case?

21        A.    Estimated, yeah.

22        Q.    Okay.  It was your testimony, I believe,

23   that you don't have any type of documentation to

24   confirm the amount of time that you have spent doing

25   any of the legal research or preparation for this

Page 136

1    lawsuit; is that correct?

2         A.   Yes.

3         Q.   Okay.  You've not kept any records of I

4    spent an hour on this day at any point?

5         A.   That's correct.

6         Q.   Okay.  Do you have any way to actually

7    verify independently the amount of time that you've

8    spent?

9         A.   I don't know.

10        Q.   Okay.  When is the last time that you made

11   an art piece?

12        A.   I don't remember.  I know not this year.

13   And I don't think last year.

14        Q.   Okay.  Do you have any inventory left at

15   your -- I guess at your home?

16        A.   Nothing ready to sell.

17        Q.   Okay.  Have you been purchasing or

18   otherwise acquiring materials to make artwork?

19        A.   No.

20        Q.   When was the last time that you did that?

21        A.   I don't remember.  Not this year.  And I

22   don't think last year.

23        Q.   Where do you get materials?

24        A.   So for the taxidermy, there's like snake

25   breeders and reptile breeders.  So if their snake

Page 137

1    passes away, they're willing to sell it.  Some

2    things are from hunters or trappers during the, you

3    know, proper hunting seasons.

4         Q.    With the money that you made at the

5    festivals and through WitchLab, how much or how many

6    expenses did you have?  So, for example -- I mean,

7    like what's your return on investment here; what's

8    the difference between what you're selling it at

9    versus what you're buying the materials?

10        A.    Oh.  Do you want me to deduct other costs

11   as well like traveling and --

12        Q.    Sure.

13        A.    -- materials?  I am not too sure.

14        Q.    Okay.

15        A.    I know if I -- if I purchase, let's say, a

16   snake -- well, I'll put it like this.  If someone

17   brought me their pet snake and wanted me to do a

18   skeleton, I charge about $100 a foot, maybe 75,

19   depending on the size, like -- and the position.

20   The glue and having the little bugs eat the meat off

21   the bones, that would probably be an expense of

22   about 100 bucks.  Of course, the bugs -- you know,

23   once you buy those, you have them for a while.

24   They'll die eventually and then you have to buy

25   more.  But I would say within a year I'd probably --

Page 138

1    I'd probably put maybe -- an estimate -- 20,

2    25 percent towards expenses.

3        Q.   Okay.  So would you agree then that the

4    numbers that you put in your affidavit for your

5    income totals for '21, '22, '23, '24, and '25 are

6    not inclusive or less the amount of money that you

7    had to buy or spend for materials?

8        A.   So the amount does not account for

9    expenses.

10       Q.   Okay.

11       A.   So -- well, deductions.

12       Q.   Okay.

13       A.   I meant deductions.

14            MS. AMLUNG:  Okay.  So then I think

15            that's all the questions I have.  But I am

16            going to make a request for all of your

17            receipts to know how much money you were

18            spending on the materials to make these

19            art pieces.

20            MR. SPENCER:  Okay.

21            MS. AMLUNG:  And any documentation,

22            including your Internet search history, to

23            document the amount of time that you are

24            spending online doing legal research which

25            you claim is related to this case.

Page 139

1          MR. SPENCER:  Okay.

2          MS. AMLUNG:  Okay.  Could we just

3     take a two-minute break or five-minute

4     break if you want to run to the restroom?

5     And I just want to make sure I've gotten

6     everything that I had written down, and I

7     think we're about done, okay?

8          MR. SPENCER:  Okay.

9          MS. AMLUNG:  Okay.

10         THE VIDEOGRAPHER:  We are off the

11    record.

12         (A brief recess was taken.)

13         THE VIDEOGRAPHER:  We are back on the

14    record.

15         MS. AMLUNG:  Okay.  I promise, we're

16    almost finished so that we can all get

17    lunch.

18 BY MS. AMLUNG:

19    Q.   The last two questions that I have that I

20 just needed to ask.  So in your discovery responses

21 you also are claiming emotional distress damages.

22 Can you just explain what that means to you?

23    A.   Emotional distress is -- well, the anxiety

24 and like how -- like I don't want to say anger

25 issues, but just being generally pissed off, having

Page 140

1   to go to court.  And then I guess I'm a bit more

2   moody and just haven't been able to find joy in

3   doing anything at home, like just. . .

4        Q.   Okay.  What kind of things did you do

5   before your encounter with Deputy Ganshirt that

6   you're claiming you can't do now?

7                   MR. SPENCER:  Can we take a break?

8                   MS. AMLUNG:  Sure.

9                   (A brief recess was taken.)

10                  THE VIDEOGRAPHER:  We are back on the

11            record.

12  BY MS. AMLUNG:

13       Q.   So you've made a claim as well for

14  emotional distress damages, loss of familial and

15  social time.  So what types of -- of course nonwork

16  and income related, but what kinds of social,

17  familial enjoyment related things did you do before

18  your encounter with Deputy Ganshirt that you cannot

19  do now?

20       A.   Since I'm spending most of my time

21  researching laws and court procedures and keeping on

22  top of paperwork, I have not been able to attend

23  religious and spiritual events as often as I'd like.

24  The WitchLab would occasionally hold educational

25  events and then going to powwows and spending

Page 141

1    just -- I mean, just spending time with friends.  I

2    would go to -- for example, my friend Phillip, who

3    has the honey bees at his property -- I would help

4    him at the farm with the sheep and chickens from

5    time to time.  Going on hikes with my friend Aaron.

6    Him and I usually went for day hikes, and we haven't

7    gone on any backpacking hikes, but -- and then just

8    like I wanted, again, to -- solo smithing, which is

9    a hobby.  One, because a decline in financial.  Also

10   just, you know, time of doing this.

11        Q.   Have you treated with any mental health

12   professional related to the emotional damages you

13   claimed to have incurred because of your interaction

14   with Deputy Ganshirt?

15        A.   I have not sought out any -- what do you

16   call them -- psychology type to discuss emotional

17   stress.  Yeah, that's all.

18        Q.   Okay.  Prior to your interaction with

19   Deputy Ganshirt had you ever been diagnosed with

20   anxiety or depression?

21        A.   No.

22        Q.   Okay.  And you have not been diagnosed

23   since, since you said you haven't sought out any

24   treatment; is that fair?

25        A.   That's correct.

Page 142

1          MS. AMLUNG:  Okay.  All right.  I

2     believe that's all the questions I have.

3          THE VIDEOGRAPHER:  We are off the

4     record.  The time is 12:59.

5          (Witness excused.)

6     (Deposition concluded at 12:59 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 143

1               A C K N O W L E D G E M E N T

2

3    STATE OF _____    :

4    COUNTY OF _____    :

5

6         I, JEREMY SPENCER, have read the transcript

7    of my testimony given under oath on October 3, 2025.

8            Having had the opportunity to note any

9    necessary corrections of my testimony on the errata

10   page, I hereby certify that the above-mentioned

11   transcript is a true and complete record of my

12   testimony.

13

14

15          _____

16                    JEREMY SPENCER

17

18

19

20

21

22

23

24

25

Page 144

1   COMMONWEALTH OF KENTUCKY      )

2   COUNTY OF BOONE               )

3

4           I, Kristina L. Laker, Court Reporter and

5   Notary Public in and for the Commonwealth of

6   Kentucky, do hereby certify:

7           That the witness named in the deposition,

8   prior to being examined, was by me duly sworn;

9           That said deposition was taken before me

10  at the time and place therein set forth and was

11  taken down by me in shorthand and thereafter

12  transcribed into typewriting under my direction and

13  supervision;

14          That said deposition is a true record of

15  the testimony given by the witness and of all

16  objections made at the time of the examination.

17          I further certify that I am neither

18  counsel for nor related to any party to said action,

19  nor in any way interested in the outcome thereof.

20          IN WITNESS WHEREOF I have subscribed my

21  name and affixed my seal this 21st day of October,

22  2025.

23
                        /s/ Kristina L. Laker
24                      _____
                        Kristina L. Laker
25                      Notary ID 592345